STATE OF NORTH CAROLINA v. FRANK EDWIN CORLEY

No. 66A83

(Filed 10 January 1984)

**1. Criminal Law § 75.2— voluntariness of confession—statement by officer that "things would be a lot easier" if defendant told the truth**

In a prosecution for first degree murder, the trial court correctly denied defendant's motion to suppress his inculpatory statements where the totality of the circumstances clearly compelled the trial court's determination that the defendant's statements were not induced by any hope or fear arising from the conduct of the officers and, therefore, were voluntary. The evidence tended to show that defendant walked into the sheriff's department on the afternoon of August 4, 1982 and told Officer Lockman that he wanted to report a stolen car; Officer Lockman gave him paper and pen and left the room, returned later with another officer, and advised the defendant of his constitutional rights; defendant gave his statement indicating that a friend of his needed a place to put a new Corvette for a couple of days and defendant kept it at a house near his; after questioning defendant's sister briefly later on in the afternoon, another officer went in and again advised defendant of his constitutional rights, and defendant gave this officer a similar statement; a Detective Lambert obtained a written statement from defendant several hours later and testified that at some point in the questioning he told the defendant something similar to "things would be a lot easier on him if he went ahead and told the truth"; defendant gave Lambert a statement in which he indicated that a friend had asked him to help get a car, and defendant and his friend had gone to a Corvette car lot and left with one of the salesmen, and that upon driving to a point, defendant walked away and another man and defendant's friend hit the salesman and defendant found blood in the car; that defendant later said that the car salesman had been shot in the head; that defendant then proceeded to take the officer to where the car salesman's body could be found; that when the officers realized the body would be found in another county they took the defendant to the jail in that county and when defendant in-

dicated he was tired they left and came back the next morning, advised him of his rights, and defendant then gave a statement which indicated that he had taken the Corvette for a test drive and subsequently shot and killed the car salesman.

**2. Criminal Law § 112.6— failure to instruct on insanity—no error**

The trial court properly failed to instruct on the defense of insanity in a first degree murder prosecution where defendant presented expert testimony tending to show that he had a low stress tolerance as well as an antisocial personality type and that he tended to misconstrue situations and respond inappropriately; that such factors, when considered together with the defendant's alleged drug use on the day of the killing, rendered the defendant unable to form the specific intent to kill necessary for a finding of murder in the first degree. This evidence justified the instructions the trial court gave the jury concerning the effect of voluntary intoxication on the issue of specific intent, but it did not require an instruction on the defense of insanity.

**3. Kidnapping § 1.3— error in instructions concerning kidnapping in first degree—jury verdict considered as verdict of guilty of kidnapping in the second degree**

Where defendant was charged in the bill of indictment alleging all the essential elements of kidnapping in the first degree set forth in G.S. 14-39 but where the trial court erred in its charge to the jury by failing to include as an element of the offense of kidnapping in the first degree that the victim "either was not released in a safe place or had been seriously injured or sexually assaulted," and where the jury returned a verdict of guilty of kidnapping in the first degree, the jury necessarily found facts establishing the offense of kidnapping in the second degree, and the jury verdict will be considered as a verdict of kidnapping in the second degree.

**4. Criminal Law § 138— sentencing for larceny—aggravating factor that offense was committed for "pecuniary gain" improperly considered**

Since there was no evidence tending to show that defendant was hired or paid to commit any of the crimes charged, the trial court erred in finding as an aggravating factor that the larceny was committed for "pecuniary gain" within the meaning of G.S. 15A-1340.4(a)(1)(c), and the larceny case must be remanded to the trial court for resentencing.

Justice EXUM concurring in part and dissenting in part.

APPEAL by the defendant from Judgments of *Lewis, Judge,* entered November 20, 1982, in Superior Court, BUNCOMBE County. Heard in the Supreme Court October 6, 1983.

The defendant was tried upon bills of indictment, proper in form, charging him with murder in the first degree, kidnapping and larceny. The defendant having pled not guilty, the jury found him guilty of murder in the first degree on the basis of premeditation and deliberation and on the basis that the killing occurred during the commission of a felony. The jury also found the defendant guilty of kidnapping in the first degree and

larceny. After a separate sentencing proceeding, the jury recommended that the defendant be sentenced to life imprisonment for the murder. The kidnapping and larceny convictions were consolidated for judgment and the defendant received an additional sentence of imprisonment for forty years to begin at the expiration of the life sentence. The defendant appealed the judgment sentencing him to life imprisonment to the Supreme Court as a matter of right under G.S. 7A-27(a). On June 17, 1983, the Supreme Court allowed the defendant's motion to bypass the Court of Appeals on the kidnapping and larceny convictions.

*Rufus L. Edmisten, Attorney General, by Joan H. Byers, Assistant Attorney General, for the State.*

*Adam Stein, Appellate Defender, by Malcolm Ray Hunter, Jr., Assistant Appellate Defender, for the defendant appellant.*

MITCHELL, Justice.

The defendant has presented on appeal several assignments of error relating to the trial of the cases against him and other assignments relating solely to the sentencing procedures employed by the trial court. We find without merit the defendant's contentions that his inculpatory statements to law enforcement officers should have been excluded from evidence and that the trial court should have instructed the jury concerning the insanity defense. For error in the trial court's instructions to the jury, however, the judgment against the defendant for kidnapping in the first degree must be vacated and that case remanded for the entry of judgment against the defendant for kidnapping in the second degree and imposition of a sentence upon that judgment. The larceny case against that defendant must be remanded for resentencing as a result of the trial court's error in finding as an aggravating factor for purposes of sentencing that the offenses were committed for pecuniary gain.

The State offered evidence at trial tending to show the following:

Ted Sellars, a used car salesman, worked at David's Auto House in Buncombe County. At 4:10 p.m. on August 3, 1982, Sellars was with a customer and came in to get the keys to an orange Corvette. Sellars was next seen at approximately 4:15 p.m. at a nearby market where he purchased $2.00 worth of gas while an unidentified man who was driving the orange Corvette pumped the gas.

Jeffrey Blake testified that he and the defendant were friends and that he had seen the defendant with a handgun for the first time on August 1, 1982. Blake testified that he was with the defendant all day on August 3, 1982, until approximately 3:30 p.m. when Blake went to work. Blake testified that, to his knowledge, the defendant had not taken any drugs before Blake went to work but had some LSD in his possession. Blake saw the defendant again at approximately 9:30 p.m. on the same day. The defendant told Blake that he had a nice car that he wanted to show Blake and asked if Blake could take him to Florida. When Blake indicated that he could not leave his job, the defendant told him that he was only kidding about the car.

Billie Faye Hamilton testified that she saw the defendant at a campground at approximately 5:30 p.m. on August 3. The defendant drove up to her camper in an orange Corvette and asked her for a rag.

Michael Owen testified that he saw the defendant at the campground between 5:00 and 6:00 p.m. on August 3. The defendant pulled up in an orange Corvette which he said a friend had brought to him from Florida.

Victor DeCarlo testified that he lived in Cruso, North Carolina, next to the defendant's brother's house. The defendant came to DeCarlo's house in an orange Corvette at approximately 6:00 p.m. on August 3, 1982. The defendant asked if he could park the car in front of DeCarlo's house. The defendant told DeCarlo that he did not want to take the car up the driveway to his house as he was afraid the driveway might cause damage to the car. The defendant said that the car belonged to a friend of his in Florida.

Richard Alexander of the Haywood County Sheriff's Department testified that he was driving up the road where the defendant lived on August 4, 1982 in response to a call. He passed the defendant in the road at that time. Alexander saw an orange Corvette sitting at the end of the road about a quarter of a mile from the house in which the defendant was living. Having noticed that the car had no license tags, Alexander called his office to determine whether the vehicle was wanted or stolen.

After a *voir dire* hearing had been held concerning the admissibility of statements made by the defendant, Odell Lockman

of the Haywood County Sheriff's Department testified that the defendant came into the Sheriff's Department on the afternoon of August 4, 1982 and said that he wanted to report a stolen car. The defendant then told Lockman that there was a car he knew had been stolen by two boys. The defendant stated that he had seen a deputy looking at the car and wanted to come in and report the stealing of the car. Lockman asked the defendant if he wanted to make a statement against the two people who had stolen the car, and the defendant indicated that he did. Lockman gave the defendant paper and pen and left the room. The defendant then wrote out a statement in which he stated that an old friend named Eugene had brought the Corvette by the defendant's house at approximately 5:30 p.m. on August 3, 1982. Eugene told the defendant he needed a place to put the car for a few days. The defendant took the car for a drive while Eugene and others waited in another car. The defendant parked the car near his neighbor's house and gave Eugene the keys. Eugene said that he would be in touch with the defendant in a couple of days and left. The defendant stated that he had not heard from Eugene.

The State introduced other statements made by the defendant on August 4 and August 5. The defendant at first indicated that he had been present when others had attacked Sellars. He later made a statement in the nature of a confession, however, in which he admitted that he shot the deceased several times and left him in the woods. He then took the Corvette to the campground and cleaned the blood from the interior before taking it to his home. The defendant took law enforcement officers to the place where Sellars' body was found.

Dr. Paul Dittinger testified that he performed an autopsy on the deceased. He found five gunshot wounds to the left side of the head and one gunshot wound to the hand. In Dr. Dittinger's opinion, the cause of death was multiple gunshot wounds to the head.

The defendant offered evidence tending to show the following:

The defendant testified on his own behalf that he was with Jeffrey Blake on August 3, 1982. He was hitchhiking with Blake between 11:00 a.m. and 12:00 noon when he took some LSD. Later that afternoon, his sister took him to Asheville and left him. At

that time, he was still feeling the effects of the LSD which he said was very powerful.

He and the car salesman went out to test drive the Corvette that afternoon. The defendant testified that he remembered stopping at a gas station but did not remember minute by minute what he did there. He testified that he had an automatic pistol with him at that time. He remembered pulling the Corvette into some woods and telling Sellars to get out of the car. The last thing that he heard was a gunshot. The next thing he remembered was driving down a gravel road.

While he was walking his dog the next day, the defendant saw a member of the Sheriff's Department. The defendant was thinking about what had happened the day before and was scared and confused. He knew he had something on his conscience he wanted to get off and he went to the Sheriff's Department. At that time, the defendant knew to the best of his memory that Sellars was hurt. The defendant stated that he had a lot on his mind at that time and wanted to get it off, but he did not know how to put it.

The defendant testified that he at no time intended to kill the deceased. He could remember driving with Sellars, but he could not remember the actual killing. He admitted that the first statement he made at the Sheriff's Department was false but stated that at the time he made the statement he was not sure it was false.

The defendant testified that he seemed to remember taking the gun out and asking Sellars to get out of the car. Sellars would not get out of the car but just sat there. The defendant testified that Sellars then put his leg over the console and his arm on the seat. The last thing the defendant remembered was the gun going off.

Dr. Anthony Sciara, a licensed psychologist, testified that he met with the defendant in the Buncombe County Jail on three occasions in October and November of 1982. The results of tests given the defendant were consistent with a confused adolescent with some amount of thinking problems and an antisocial personality diagnosis. Dr. Sciara indicated that the defendant's personality style is that of an underincorporator who responds

rather than thinking through a situation carefully. Dr. Sciara also stated that the defendant had an extratensive problem solving style or tended to respond emotionally without thinking things through. Dr. Sciara additionally was of the opinion that the defendant suffers from a chronic lack of stress tolerance. Dr. Sciara testified that in his opinion the defendant might not have had the intent to kill anyone, but may have been responding reflexively in a stressful situation using poor judgment.

Dr. Dennis Christensen, a psychiatrist, testified that he interviewed the defendant on three occasions in the jail. In his opinion the defendant could not have formed the intent to kill Sellars.

[1] The defendant first assigns as error the trial court's denial of his motion to suppress all statements made by him to law enforcement officers. Prior to trial the defendant filed a written motion to suppress in which he contended that the suppression of this evidence was required on grounds that:

1) Its exclusion is required by the Constitution of the United States or the Constitution of North Carolina, in that the Defendant was not informed of his rights prior to making a statement, and was not afforded the opportunity to have a lawyer present upon the obtaining of any and all statements made by the Defendant while in custody.

2) The statements obtained from the Defendant were made as a result of substantial violation of the provisions of Chapter 15A of the General Statutes, in that the statements were made by the Defendant to the officers as a result of a plea bargain and/or promises of help that the officers might be able to procure for the Defendant if the Defendant cooperated, and that these actions by the officers were coercive in nature.

After conducting an extensive *voir dire* hearing, the trial court entered findings of fact and conclusions of law and denied this motion.

Before this Court, the defendant argues only one ground for the asserted inadmissibility of his statements. He argues that the investigating officers induced in him a hope or fear which resulted in his making inculpatory statements, and that those statements were, as a result, involuntary and inadmissible.

The defendant specifically bases his argument upon the finding of the trial court that during the investigations of the crimes charged Officer Lambert told the defendant that "things would be a lot easier on him if he went ahead and told the truth." The defendant contends that *State v. Pruitt*, 286 N.C. 442, 212 S.E. 2d 92 (1975) controls the present case and that the trial court, having made the quoted finding, was required as a matter of law to conclude that this statement by Officer Lambert was a suggestion of hope or fear which induced the defendant's statements and thereby rendered them involuntary and inadmissible for any reason. The defendant seems to contend, in other words, that the line of cases culminating in *Pruitt* established an absolute or per se rule requiring the exclusion of a defendant's confession as involuntary in any case in which the defendant is told prior to confessing that "things would be a lot easier on him if he went ahead and told the truth" or harder for him if he did not. We reject the use of any such absolute or per se rule in resolving issues surrounding the voluntariness and admissibility of confessions by defendants. We do not think that any such test is required by *Pruitt* or any other decision of this Court.

It is true that in *Pruitt* we said that the officer's statement that it would be harder on the defendant if he did not cooperate, "certainly . . . would imply a suggestion of hope that things would be better for defendant if he would cooperate, *i.e.* confess." *State v. Pruitt*, 286 N.C. at 458, 212 S.E. 2d at 102. In that case, however, we specifically pointed out that the statement by the officer that it would be harder on the defendant if he did not cooperate was preceded by other circumstances which tended to provoke fright in the defendant and overbear his will. *Id.* Further, we indicated in *Pruitt* that, once it is established that the procedural requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966) have been met, the determination of whether the defendant's confession was voluntarily and understandingly made must be found from a consideration of the entire record. *State v. Pruitt*, 286 N.C. at 454, 212 S.E. 2d at 100. In such cases courts must look to the totality of the circumstances in determining whether the confession was in fact voluntarily and understandingly made. *State v. Fincher*, 309 N.C. 1, 19, 305 S.E. 2d 685, 697 (1983); *State v. Jackson*, 308 N.C. 549, 581, 304 S.E. 2d 134, 152 (1983); *State v. Branch*, 306 N.C. 101, 107, 291 S.E. 2d 653, 658 (1982); *State v.*

*Thompson,* 287 N.C. 303, 318, 214 S.E. 2d 742, 751 (1975); *State v. Wright,* 274 N.C. 84, 90, 161 S.E. 2d 581, 590 (1968). *See State v. Chamberlain,* 263 N.C. 406, 411, 139 S.E. 2d 620, 623 (1965) (totality of the circumstances test applied prior to the decision in *Miranda*).

Any possible confusion concerning the appropriate scope of the inquiry to be made in determining whether a defendant's confession was voluntarily and intelligently made was put to rest by our recent statement that:

The North Carolina rule and the federal rule for determining the admissibility of a confession is the same. It is a rule or test of voluntariness in which the court looks at the totality of the circumstances of the case in determining whether the confession was voluntary.

*State v. Jackson,* 308 N.C. 549, 581, 304 S.E. 2d 134, 152 (1983). Further, we have recently indicated that this principle controls "without regard to whether the claim of inadmissibility rests upon constitutional grounds or rests solely upon our rule of evidence requiring the exclusion of involuntary confessions." *State v. Branch,* 306 N.C. at 108, 291 S.E. 2d at 658.

An absolute rule requiring exclusion of statements to law enforcement officers by a defendant in custody and who did not assert his right to counsel has been applied only in those cases in which the officers failed to comply with procedural safeguards required by *Miranda.* In cases in which the requirements of *Miranda* have been met and the defendant has not asserted the right to have counsel present during questioning, no single circumstance may be viewed in isolation as rendering a confession the product of improperly induced hope or fear and, therefore, involuntary. In those cases the court must proceed to determine whether the statement made by the defendant was *in fact* voluntarily and understandingly made, which is the ultimate test of the admissibility of a confession. In determining whether a defendant's statement was in fact voluntarily and understandingly made, the court must consider the *totality of the circumstances* of the case and may not rely upon any one circumstance standing alone and in isolation. *See State v. Lynch,* 279 N.C. 1, 13, 181 S.E. 2d 561, 568-69 (1971).

We turn then to an examination of the totality of the circumstances surrounding the defendant's inculpatory statements. The evidence for the State during the *voir dire* hearing to determine the admissibility *vel non* of the defendant's inculpatory statement tended to show the following:

The defendant walked into the Sheriff's Department on the afternoon of August 4, 1982 and told Deputy Odell Lockman that he wanted to report a stolen car. The defendant said that he had seen a deputy looking at a car which the defendant knew had been stolen by two other people. Lockman asked the defendant if he wanted to make a statement against the two. When the defendant indicated that he wanted to make a statement, Lockman gave him paper and pen and left the room.

Lockman returned to the room later with another officer and advised the defendant of his constitutional rights. Lockman obtained the statement the defendant had written out at that time. The defendant indicated in that statement that he had seen an old friend named Eugene on July 31, 1982. Eugene had asked the defendant if he wanted to make some money and told him that he needed a place to put a car for a couple of days. Eugene came to the defendant's house in a Corvette around 5:30 p.m. on August 3, 1982. The defendant took the car for a drive while Eugene and others waited in another car. The defendant parked the car near a neighbor's house and gave Eugene the keys. Eugene said he would be in touch with the defendant in a couple of days and left.

At approximately 5:00 p.m. on August 4, 1982, Lieutenant Will Annarino of the Asheville Police Department and another officer arrived at the Haywood County Sheriff's Department. After questioning the defendant's sister briefly, Annarino went into the room with the defendant. He showed the defendant the standard waiver of rights form which had been used by Lockman and the other officer in advising the defendant of his constitutional rights. Annarino asked the defendant whether he had been advised of and understood those rights and handed him the waiver of rights form. The defendant indicated that he understood them.

The defendant indicated that Eugene had come to the defendant's house the afternoon of the prior day driving the orange Corvette. His statement was essentially consistent with the statement he had given Lockman except that he indicated that he took

his sister to ride in the Corvette before parking it near a neighbor's house. Annarino left the room and Detective Ted Lambert of the Asheville Police Department questioned the defendant.

Detective Lambert obtained a written statement from the defendant at approximately 7:00 p.m. on August 4, 1982. Detective Lambert testified that, at some point during this sequence of questioning, he told the defendant that it would be best to tell the truth. He also testified that he told the defendant that he would tell the district attorney if the defendant cooperated and that in fact he had since told the district attorney that the defendant cooperated. The trial court found that the statement by Lambert at this point was that "things would be a lot easier on him if he went ahead and told the truth."

In the statement the defendant gave Lambert, the defendant said that Eugene asked him to help him get a car. The defendant went to the car lot on August 3 and left in the Corvette with Sellars. The defendant drove down a gravel road to a point where Eugene and others waited and told Sellars that he was not going to hurt him. The defendant told Sellars that he wanted the car. Eugene and another man then walked over to the car and the defendant walked away. The defendant did not know if Eugene and the other man hit Sellars, but there was blood in the car. Eugene and others put Sellars in another car and drove off. The defendant drove the Corvette to a campground and cleaned the blood from the car.

Haywood County Sheriff Charlie Arrington testified that he arrived at the Haywood County Sheriff's Department at approximately 10:00 p.m. on the evening of August 4, 1982, after having returned from unsuccessfully searching for Sellars' body. He advised the defendant of his constitutional rights and the defendant agreed to answer questions without a lawyer present. Sheriff Arrington told the defendant that Sellars might still be alive and asked the defendant to help find him. He told the defendant that there was a difference between assault and murder. The defendant then told Arrington that Sellars had not been hit with a stick but had been shot in the head. The defendant then asked to talk to Officer Lambert. The defendant told Lambert that Sellars had been shot and that the defendant could take him to where it had

happened. At the defendant's request Lambert and the defendant then got into one car and the other officers got into another car. The group drove as the defendant directed them to a point where Sellars' body was found.

Having determined that the victim was killed in Buncombe County and not in Haywood County, Lambert took the defendant to the Buncombe County Jail arriving at approximately 4:00 a.m. on August 5, 1982. Lambert told the defendant he would like to talk to him some more about the case. The defendant stated that he would rather not since he was tired. Lambert said that he was tired, too, and he would come back and talk to the defendant in the morning. The defendant said that that would be all right.

Lambert next saw the defendant at approximately 11:00 a.m. on August 5 and advised him of his constitutional rights. The defendant signed a standard waiver of rights form at that time. The defendant then told Lambert that he went to David's Auto House on August 3 to test drive the orange Corvette. He said that he had been thinking about stealing the car because he always wanted one. The defendant then stated to Lambert that:

> We traveled a distance of about 8 miles. There was a house there and I told Ted that was my mother's house. We pulled up in the driveway and I opened my door and said, "Ted you don't know me very well. I don't want to use this gun. I just want you to get out." He didn't get out. I told him again to get out. Then he put his leg over the console coming toward me. I then shot him in the head. He kept coming at me and I shot again I don't know how many times. He fell back into his seat and I went around and opened his door and took him out in the woods and laid him down.

The defendant took the stand and testified on his own behalf during the *voir dire* hearing. For the most part his testimony was consistent with the evidence offered by the State during the *voir dire* hearing. The defendant testified that Lambert told him that "he would make things a lot easier on me if I would go ahead and tell him everything I know." The defendant also testified that one of the officers cursed him at some point during the questioning and at another time called him a "punk." The defendant testified, however, that he was not afraid of the officers at any time during

any of the questioning. He testified that he was more "hurt" by the officer's rudeness to him than afraid.

At no point in the defendant's testimony during the *voir dire* hearing did he indicate that his final statement to Lambert was untrue or that he did not kill Sellars. At no time during the defendant's testimony did he say that any statement to him by Lambert or any other officer caused him to hope to gain in any way by confessing to the crimes under investigation.

The trial court made findings of fact essentially in accord with the evidence offered during the *voir dire* hearing by the State. With regard to the statement by Lambert to the defendant, however, the trial court made a finding in accord with the defendant's testimony and found as a fact that Lambert told the defendant that "things would be a lot easier on him if he went ahead and told the truth." Based upon these findings of fact, the trial court determined that the inculpatory statements by the defendant were not the result of any fear or hope of reward and were, therefore, voluntary and admissible.

In a *voir dire* hearing on the admissibility of a defendant's confession, the trial court must determine whether the State has borne its burden of showing by a preponderance of the evidence that the defendant's confession was voluntary. *State v. Johnson*, 304 N.C. 680, 285 S.E. 2d 792 (1982). The preponderance of the evidence test is not, however, to be applied by appellate courts in reviewing the findings of the trial court. *Id.* The findings by the trial court are conclusive and binding upon appellate courts if supported by competent evidence in the record. *Id.* This is true even though the evidence is conflicting. *State v. Jackson*, 308 N.C. 549, 304 S.E. 2d 134 (1983). The trial court's conclusions of law, however, are fully reviewable by appellate courts. *State v. Pruitt*, 286 N.C. 442, 212 S.E. 2d 92 (1975).

The findings of the trial court at the conclusion of the *voir dire* hearing in the present case were supported by plenary competent evidence. In fact, most of the findings were supported by the defendant's own sworn testimony during the *voir dire* hearing. Those findings are binding upon this Court. The totality of the circumstances clearly compelled the trial court's determination that the defendant's statements were not induced by any

hope or fear arising from the conduct of the officers and, therefore, were voluntary.

We also note that one of the grounds upon which the defendant sought by his written motion to have his statements suppressed was that his statements were excludable under G.S. 15A-974(2) as having been obtained as a result of a substantial violation of the provisions of Chapter 15A of the General Statutes. In enacting G.S. 15A-974(2) the legislature specifically adopted the well established totality of the circumstances standard for use by courts in determining whether a substantial violation of the provisions of Chapter 15A has occurred. Even if a substantial violation of Chapter 15A is found to exist, it must also appear that the confession was obtained "as a result of" such official illegality before it will be suppressed. *State v. Richardson*, 295 N.C. 309, 245 S.E. 2d 754 (1978).

Upon a review of the totality of the circumstances, it is readily apparent that no substantial violations of the provisions of Chapter 15A occurred in this case. Certainly, the defendant's statements were not obtained as a result of any such violation. We hold that the trial court correctly denied the defendant's motion to suppress his inculpatory statements.

[2] The defendant next assigns as error the trial court's failure to instruct the jury on the defense of insanity. It is not clear from the record that the defendant objected to the trial court's failure to give this instruction or that he in fact requested that the instruction be given. Assuming *arguendo* that this assignment of error is properly before us, we find it to be without merit because there was no evidence presented which would have required an instruction on the defense of insanity.

The test of insanity as a defense to a criminal prosecution in North Carolina is

> whether defendant, at the time of the alleged act, was laboring under such a defect of reason, from disease or deficiency of mind, as to be incapable of knowing the nature and quality of his act, or if he does know this, was by reason of such a defect of reason incapable of distinguishing between right and wrong in relation to such act.

*State v. Vickers,* 306 N.C. 90, 94, 291 S.E. 2d 599, 603 (1982). This test is widely known as the M'Naghten Rule.

The defendant presented expert testimony tending to show that he had a low stress tolerance as well as an antisocial personality type and that he tended to misconstrue situations and respond inappropriately. His evidence also tended to show that such factors, when considered together with the defendant's alleged drug abuse on the day of the killing, rendered the defendant unable to form the specific intent to kill necessary for a finding of murder in the first degree. This evidence justified the instructions the trial court gave the jury in this case concerning the effect of voluntary intoxication on the issue of specific intent. *See State v. Kirkley,* 308 N.C. 196, 302 S.E. 2d 144 (1983). The evidence did not, however, require an instruction on the defense of insanity. *See State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979); *State v. Jones,* 293 N.C. 413, 238 S.E. 2d 482 (1977). Further, it was not error for the trial court to refuse to instruct the jury that a mental disorder not falling within the M'Naghten Rule might in itself negate the elements of specific intent and premeditation and deliberation. *State v. Kirkley,* 308 N.C. 196, 302 S.E. 2d 144 (1983); *State v. Anderson,* 303 N.C. 185, 278 S.E. 2d 238 (1981). This assignment of error is without merit.

The defendant also assigns as error the action of the trial court in excluding for cause, prior to the guilt-innocence determination phase of his trial, prospective jurors who indicated that they could never under any circumstances vote to recommend a sentence of death. This argument is without merit. *State v. Avery,* 299 N.C. 126, 261 S.E. 2d 803 (1980).

For the foregoing reasons, we find that there was no prejudicial error relative to the defendant's trial and conviction for murder. We have determined, however, that certain errors relating to the remaining charges were committed by the trial court. We next undertake a discussion of those errors.

[3] We turn to a consideration of the defendant's conviction of kidnapping in the first degree. The language of subsection (a) of G.S. 14-39 creates and defines the offense of kidnapping. The language of subsection (b) addresses the degree of the crime and defines kidnapping in the first degree as a kidnapping in which the defendant does not release the victim in a safe place or in

which he seriously injures the victim or sexually assaults the victim. The two subsections taken together establish the elements of kidnapping in the first degree. *State v. Jerrett*, 309 N.C. 239, 261, 307 S.E. 2d 339, 351 (1983). The language of subsection (b) states essential elements of the offense of kidnapping in the first degree and does not relate to matters in mitigation of punishment. *Id.* To properly convict a defendant of kidnapping in the first degree, the State must allege and prove the applicable elements of both subsection (a) and subsection (b). *Id.*

The defendant in the present case was charged in a bill of indictment alleging all of the essential elements of kidnapping in the first degree set forth in G.S. 14-39. The jury returned a verdict finding the defendant guilty of the offense charged. The trial court erred in its charge to the jury, however, since it failed to include as an element of the offense of kidnapping in the first degree that the victim "either was not released in a safe place or had been seriously injured or sexually assaulted . . . ." G.S. 14-39(b); *State v. Jerrett*, 309 N.C. 239, 261, 307 S.E. 2d 339, 351 (1983).

The defendant is not, however, entitled to a new trial. In failing to submit the essential element of kidnapping in the first degree set forth in subsection (b) of G.S. 14-39, the trial court essentially submitted to the jury the offense of kidnapping in the second degree. *See State v. Gooch*, 307 N.C. 253, 257-58, 297 S.E. 2d 599, 602 (1982). In finding the defendant guilty of kidnapping in the first degree, the jury necessarily found facts establishing the offense of kidnapping in the second degree. *Id.* The jury's verdict will be considered a verdict of guilty of kidnapping in the second degree. *Id.* We, therefore, leave the verdict undisturbed but recognize it as a verdict of guilty of the lesser included offense of kidnapping in the second degree, vacate the judgment imposed upon the verdict of guilty of kidnapping in the first degree and remand the case to the Superior Court, Buncombe County, for judgment and resentencing as upon a verdict of guilty of kidnapping in the second degree.

[4]   We next consider the defendant's conviction of larceny. The defendant contends that the trial court erred in sentencing him for larceny, since the trial court found that the larceny was committed for "pecuniary gain" within the meaning of G.S. 15A-

1340.4(a)(1)(c). As there was no evidence tending to show that the defendant was hired or paid to commit any of the crimes charged, the trial court erred in finding this aggravating factor to exist. *State v. Abdullah,* 309 N.C. 63, 306 S.E. 2d 100 (1983). As a result of this error, the case against the defendant for larceny must be remanded to the trial court for resentencing. *State v. Ahearn,* 307 N.C. 584, 602, 300 S.E. 2d 689, 701 (1983).

In fairness to the trial court, we point out that the trial court did not have the benefit of this Court's opinions in *Jerrett* and *Ahearn.* Both of those cases were decided after the trial giving rise to this appeal.

Case No. 82CRS18563, Murder in the First Degree — no error.

Case No. 82CRS18564, Larceny — remanded for resentencing.

Case No. 82CRS18565, Kidnapping — judgment vacated and remanded for judgment and resentencing.

Justice EXUM concurring in part and dissenting in part.

I.

Although I concur in the result reached by the majority regarding the admissibility of defendant's inculpatory statement, I write separately to clarify a point I believe is not clearly made in the majority opinion.

The law of North Carolina on the admissibility of confessions is that a confession induced from a defendant by suggestions of hope or fear on the part of interrogating officers is involuntary and, therefore, inadmissible. "It has been long the rule in this jurisdiction that confessions induced by force, threat, fear or promise of reward are inadmissible." *State v. Richardson,* 295 N.C. 309, 326, 245 S.E. 2d 754, 765 (1978). "A promise of leniency renders a confession involuntary only if the confession is so connected with the inducement as to be the consequence of it." *State v. Pressley,* 266 N.C. 663, 666-67, 147 S.E. 2d 33, 35 (1966). But "if promises or threats have been used, it must be made to appear that their influence has been entirely done away with before subsequent confessions can be deemed voluntary, and therefore admissible." *State v. Drake,* 113 N.C. 625, 628, 18 S.E. 166, 167

(1893) (confession made within hours after arresting officer told defendant it might be easier on him if he made an honest confession; held, confession inadmissible). We have also held that an implied promise of leniency made the day before the confession and followed by defendant's assertion of his right to silence and to counsel did not render the confession involuntary because the connection between the promise and the confession was "so attenuated." *State v. Chamberlain*, 307 N.C. 130, 146, 297 S.E. 2d 540, 550 (1982).

In my view, *Chamberlain* controls the result reached by the majority. Although the time of defendant's confession to Lambert is not clear from the trial court's findings, testimony on voir dire indicates it was made around 11 a.m. on 5 August, some eighteen hours after defendant voluntarily appeared at police headquarters. Lambert testified that he had earlier told defendant that he, Lambert, did not "believe" earlier exculpatory statements defendant had given to Annarino; "that it would be best to tell the truth"; and he, Lambert, "would tell the DA that [defendant] cooperated." According to Lambert's testimony, these statements occurred before defendant's exculpatory statement given at 7:05 p.m. on 4 August. Thus, some eighteen hours elapsed between any promise of leniency and defendant's confession. During most of that period, defendant was not interrogated by officers. During much of this time defendant led the officers to the victim's body. Furthermore, defendant, who testified at length, never claimed that he finally confessed because of a promise of leniency made by any officer. Thus, in this case, it is clear that the influence of Lambert's promise "had been entirely done away with" before defendant confessed.

Unless it is made to appear that the effect of a promise of leniency has been entirely dissipated so that the confession is not the product of, or induced by, the promise, the foregoing cases make it clear that a promise of leniency followed by a confession renders the confession involuntary and inadmissible.

In the absence of a promise or threat, then our rule is that we consider the totality of circumstances to determine the voluntariness with which a confession was made. *State v. Jackson*, 308 N.C. 549, 304 S.E. 2d 134 (1983). Where, however, a promise or threat is followed by confession, the only appropriate inquiry is

State v. Corley

whether the promise or threat induced the confession. It is, of course, appropriate to consider the totality of circumstances in determining whether the effect of a promise or threat has been entirely dissipated so as not to have induced a subsequent confession where there is evidence to support such a determination. *State v. Chamberlain, supra.* If this is the vein in which the majority applies the totality of circumstances to resolve the confession admissibility question, then I have no quarrel with either the result or the analysis.

This Court said in *Pruitt*, 286 N.C. at 454, 212 S.E. 2d at 100:

The fact that the technical procedural requirements of *Miranda* are demonstrated by the prosecution does not, however, standing alone, control the question of whether a confession was voluntarily and understandingly made. *The answer to this question must be found from a consideration of the entire record.*

But the Court held in *Pruitt* that the confessions were inadmissible because they were made "under the influence of fear *or* hope, *or* both, growing out of the language and acts of those who held him in custody." *Id.*, at 458, 212 S.E. 2d at 100 (emphasis supplied). These actions and this language were described in *Pruitt* as follows:

In instant case the interrogation of defendant by three police officers took place in a police-dominated atmosphere. Against this background the officers repeatedly told defendant that they knew that he had committed the crime and that his story had too many holes in it; that he was 'lying' and that they did not want to 'fool around.' Under these circumstances one can infer that the language used by the officers tended to provoke fright. This language was then tempered by statements that the officers considered defendant the type of person 'that such a thing would prey heavily upon' and that he would be 'relieved to get it off his chest.' This somewhat flattering language was capped by the statement that 'it would simply be harder on him if he didn't go ahead and cooperate.' Certainly the latter statement would imply a suggestion of hope that things would be better for defendant if he would cooperate, *i.e.*, confess.

*Id.* Thus *Pruitt* simply reiterates and applies what has long been the law in North Carolina: In the absence of a promise or threat, all of the circumstances must be considered in determining the voluntariness of a confession. But if there is a promise or threat followed by a confession, nothing else appearing, the confession is involuntary and inadmissible.

Here, if defendant's confession was induced by Lambert's promise that "things would be a lot easier on him if he went ahead and told the truth," then his confession would be inadmissible. Our inquiry, therefore, should be limited simply to whether his confession was induced by this promise. A consideration of all the circumstances is certainly appropriate to this inquiry. Such consideration, as I have already shown above, convinces me that the confession was not induced by the promise. I assume this is what the majority intends by its reference to and application of the totality of circumstances test. I also assume the majority does not mean that if the circumstances show a confession was induced by a promise of leniency, that other circumstances might nevertheless somehow render the confession admissible.

## II.

I also disagree with the majority's conclusion that the evidence was insufficient to raise an insanity issue. Apparently, the majority's conclusion is based on the fact that no one testified in terms of the M'Naghten test, *i.e.*, that defendant,

> at the time of the alleged act, was laboring under such a defect of reason, from disease or deficiency of mind, as to be incapable of knowing the nature and quality of his act, or if he does know this, was by reason of such a defect of reason incapable of distinguishing between right and wrong in relation to such act.

*State v. Vickers,* 306 N.C. 90, 94, 291 S.E. 2d 599, 603 (1982). This should not necessarily preclude submission of an insanity issue. Indeed, there is a growing body of opinion that mental health professionals should not be permitted to testify in terms of the legal standards for insanity. Rather, they should be permitted only to describe for the jury their clinical observations of defendant's behavior and the objective data they have collected about defendant's mental state. It is then the jury's task to decide whether

State v. Corley

defendant meets the legal standard for insanity. *See generally* Kenny, *The Expert in Court,* 99 L. Q. Rev. 197 (1983); Arenella, *Reflections on the Current Proposals to Abolish or Reform the Insanity Defense,* 8 Am. J. of Law & Med. 271, 279 (1982); Morse, *Failed Explanations and Criminal Responsibility: Experts and the Unconscious,* 68 Va. L. Rev. 971 (1982); Morse, *Crazy Behavior, Morals and Science: An Analysis of Mental Health Law,* 51 So. Cal. L. Rev. 527 (1978).

The majority's position on this point at least is out of step with, if not a step backward from, the best current thinking on the insanity defense.

Here, defendant testified essentially that he did not recall precisely what happened at crucial times. He remembered being with the deceased and hearing a "gunshot." The next thing he remembered was driving down a gravel road. One expert psychologist, then president-elect of the North Carolina Psychological Association, tested and examined defendant extensively before the trial. He described in detail his clinical observations of defendant's mental state. He said that defendant did not "perceive accurately what's going on in the world" and that he was suffering from "a consistent personality defect that has been there for a considerably long period of time." This witness said that at the time of the shooting of the victim defendant "may have not had the intent to kill anyone but rather was responding reflexively in a stressful situation . . . ." A psychiatrist who had interviewed defendant several times before trial testified that defendant suffered from "the disease of chemical dependency" and was "a drug addict, an alcoholic." In this physician's opinion, the defendant at the time of the shooting of the victim "could not form an intent at that time to kill anyone. He was responding at a . . . kind of a reflex motion in a panic situation."

In my view, all of this testimony taken together was sufficient to permit the jury to consider whether at the time in question defendant was "laboring under such a defect of reason, from disease or deficiency of mind, as to be incapable of knowing the nature and quality of his act." *State v. Vickers,* 306 N.C. at 94, 291 S.E. 2d at 603.