STATE OF NORTH CAROLINA v. NORMA PRICE ALLEN

No. 902SC14

(Filed 7 May 1991)

1. **Criminal Law § 75.1 (NCI3d)— maintaining building for keeping marijuana — illegal arrest — subsequent statements admissible**

    The trial court did not err in a prosecution for knowingly maintaining a building for keeping marijuana by admitting defendant's statements to officers where officers arrived at defendant's residence with a search warrant but not an arrest warrant; defendant was detained while officers walked through the house and searched a nearby barn; a room with marijuana plants, track lighting, timers, potting soil and other gardening paraphernalia was found in the barn; and defendant subsequently made a statement to officers. The State did not appeal the trial court's order concluding that the search warrant was invalid as to defendant's house, so that the law of the case was that the officers did not have probable cause to search the house and entered it illegally; defendant was arrested when she was confined to a single area soon after officers entered her home; the officers who arrested defendant had information implicating her husband in a marijuana growing scheme, but no information about defendant, so that she was arrested without probable cause; even assuming probable cause after marijuana was found growing in the barn, defendant's arrest inside her house without a warrant was fatally defective under the Fourth Amendment to the U. S. Constitution; defendant's statements were not the product of the illegal arrest because approximately an hour and a half elapsed between the illegal intrusion into defendant's home and the giving of her statements; although defendant was held separately from her husband, not allowed to speak with him, and was in the presence of one or more officers most of the time, she was permitted to bathe and change clothes in private; defendant was thirty-five years old on the day of her arrest and licensed as a registered nurse; and there is nothing in the record showing any misconduct on the part of the officers or intent to violate the defendant's rights.

    **Am Jur 2d, Evidence § 613.**

## 2. Narcotics § 4 (NCI3d) — knowingly maintaining building for marijuana — evidence sufficient

The trial court did not err by denying defendant's motion to dismiss a charge of knowingly maintaining a building for the keeping of marijuana where, in addition to defendant's inculpatory statements, the State presented evidence that defendant and her husband held title to the property on which the barn in which marijuana was growing was situated; defendant obtained the building permit for the barn; defendant contacted the tax collector to find out whether it could be listed in her name on a separate listing; electric power to the house and barn were metered separately; the charges for the barn for February, March, and April of 1988 were low relative to the house, but much higher in August, September and October of 1988; and defendant paid the electric utility bill between 12 February 1988 and 13 September of 1988 with checks drawn on a joint bank account with her husband.

**Am Jur 2d, Drugs, Narcotics, and Poisons §§ 44, 49.**

Judge WELLS dissenting.

APPEAL by defendant from Judgment of *Judge Thomas S. Watts* entered 17 August 1989 in WASHINGTON County Superior Court. Heard in the Court of Appeals 25 September 1990.

*Attorney General Lacy H. Thornburg by Special Deputy Attorney General E. H. Bunting, Jr., for the State.*

*Kirby, Wallace, Creech, Sarda, Zaytoun and Cashwell by Narley L. Cashwell for defendant appellant.*

COZORT, Judge.

The defendant was convicted of knowingly maintaining a building used for the keeping of marijuana. On appeal she contends, *inter alia*, that inculpatory statements used against her at trial were obtained in violation of the Fourth Amendment. We find no error.

At approximately 10:50 a.m. on 28 October 1988, State Bureau of Investigation (SBI) Special Agents K. L. Bazemore and D. L. Ransome, Washington County Deputy Sheriff D. B. Spickett, and Plymouth Police Officer G. H. Hassell arrived at the residence of William Allen and defendant Norma Allen. The officers brought with them a search warrant authorizing them to search the premises

located at "Rt. 1 Box 286, Plymouth N. C." The officers did not have a warrant for the defendant's arrest.

"[D]ressed in a nightgown and robe," the defendant answered the door. Special Agent Bazemore identified himself and the other officers. At trial he testified that he told

> Mrs. Allen that we had a search warrant for her arrest and the outbuilding that had been issued by the Resident Superior Court Judge, William Griffin, and that we were going . . . were intending to search the residence that . . . I also told her that Special Agent D. M. Barrington and a Washington County Deputy Sheriff [Janice Spruill] had been dispatched to Weyerhaeuser to pick up her husband to return him to the residence also. At that time I provided her with a copy [of the search warrant].

With guns drawn, Special Agents Bazemore and Ransome walked through the house; Deputy Sheriff Spickett and Officer Hassell remained with the defendant in the den. After completing his sweep of the house, Bazemore walked approximately sixty to seventy-five feet from the residence to the "two story barn shaped outbuilding" described in the search warrant. Inside this "dutch-style" barn he found a concealed staircase leading to an upstairs room where he discovered marijuana plants, track lighting, timers, potting soil, and other gardening paraphernalia.

After Bazemore returned to the house, the defendant asked for and received permission to shower and dress. Bazemore and Ransome escorted the defendant to her bedroom, where she selected clothing under the supervision of the officers. The defendant was escorted to the bathroom, which was searched again, and she was instructed to knock on the door after she had showered and dressed so that she could be escorted back to the den. After an interval of "fifteen or twenty minutes" the defendant was taken back to the den.

At approximately 11:40 a.m. the defendant's husband, William Allen, arrived in the custody of Deputy Sheriff Spruill and Special Agent Barrington. William Allen was taken into the kitchen and advised of his constitutional rights. Shortly after questioning of William Allen began, he "indicated he did not want to make a statement; that he wanted a lawyer." At approximately 12:25 p.m. Special Agent Bazemore advised Norma Allen of her constitutional

rights from a form provided by the SBI. She consented to interrogation, which concluded at 1:53 p.m. Defendant and her husband could see each other during his brief, and her more lengthy, interrogation, but they were held and questioned separately.

At trial Bazemore's voir dire testimony indicated that he regarded Mrs. Allen as having "not been arrested" when her interrogation began. He testified, however, that, except for the period when she was showering and dressing, "there was an officer, one of us, or two or three of us, in her presence the entire time." Moreover, he testified that at no time was Norma Allen free to leave the custody of the officers.

Although characterized by Special Agent Bazemore as a "statement" taken from the defendant, no transcript of the interview between Bazemore and defendant was made. The exchange consisted of questions from Bazemore and Ransome and answers from the defendant. The "statement" introduced against the defendant at trial consisted of a synopsis of the interview based on Bazemore's notes. At trial Bazemore testified that the "only thing in this report that I'm saying are her words are those things that I have in quotes and I actually quoted at the time she said it to me."

Agent Bazemore testified that defendant initially denied any involvement in the marijuana growing operation. She later admitted knowing what her husband was doing, and she begged him not to do it. Her husband informed her that money for construction of the barn came from a man in Plymouth, who later supplied "grow lights" and 20 to 25 marijuana plants. She would not say where her husband obtained the other 170 plants. On at least three occasions, she was unable to pay the large electric bill for the barn. Her husband obtained cash from the man in Plymouth. She put the cash in her checking account and wrote a check to pay the bill. She knew the plan was that her husband would grow and harvest the marijuana and provide it to the man in Plymouth at a preset price. After expenses, what she and her husband had left was their profit.

On approximately 15 March 1989, William Allen pled guilty to manufacturing marijuana and maintaining a building used for the keeping of marijuana. He received a suspended sentence of two years in prison and was placed on probation for two years.

STATE v. ALLEN

[102 N.C. App. 598 (1991)]

Defendant Norma Allen was indicted for manufacturing a controlled substance and for maintaining a building for the keeping of a controlled substance (marijuana), violations of N.C. Gen. Stat. §§ 90-95(a)(1) and 90-108(a)(7), respectively. She pled not guilty to both charges. On 3 March 1989, the defendant moved to suppress all evidence seized in the search of the house and the barn on the grounds that Special Agent Bazemore's affidavit did not establish probable cause to search either the house or the barn and that no exigent circumstances existed at the time of the officers' arrival to justify a warrantless entry and search of either building. After a hearing on that motion, the trial court concluded that the affidavit was "sufficient to establish probable cause to search the barn located on the [Allens'] property but not the residence." Accordingly, on 14 March 1989, the court entered an order allowing the defendant's motion as to the house and denying it as to the barn. The State objected to that portion of the order suppressing evidence seized from the house but did not perfect an appeal on that issue.

On 2 June 1989, the defendant moved to suppress all evidence, "including but not limited to any and all statements by the Defendant, documents, notes, personal and business records," which could be traced "directly or indirectly to the invalid search" of her residence. On 5 June 1989, the defendant moved to suppress "any and all statements by the Defendant, which . . . can be traced to or resulted from the invalid seizure of her person at her residence." After a hearing the trial court, on 15 August 1989, entered an order denying the "defendant's objection to the admissions [sic] of the statement and her Motion to Suppress the same."

On 14 August 1989, the case below came to trial. On 17 August 1989, the defendant was found not guilty of manufacturing marijuana but guilty of knowingly maintaining a building used for the keeping of marijuana. Upon conviction of the second charge, the defendant was sentenced to imprisonment for two years (suspended except for an active term of ninety days) and to pay a fine of $4,500; she was placed on probation for five years and required to surrender her license as a registered nurse, among other conditions.

[1] On appeal the defendant assigns error to the trial court's denial of her motion to suppress her inculpatory statements. She contends that the statements were the fruit of an illegal entry

and arrest. We find no error in the trial court's decision to admit the defendant's statements made to Agent Bazemore.

Relying on *Wong Sun v. United States*, 371 U.S. 471, 9 L.Ed.2d 441 (1963), this Court has stated that, "[a]s a general rule, evidence obtained following an illegal intrusion into a defendant's home is 'tainted' by the original illegal entry and is therefore inadmissible." *State v. Yananokwiak*, 65 N.C. App. 513, 518, 309 S.E.2d 560, 564 (1983). *Wong Sun*, like the case below, presented the question of whether incriminating statements were the fruit of an illegal entry and arrest. In *Wong Sun* federal narcotic agents, with neither an arrest warrant nor a search warrant, forcibly entered a laundry, followed James Wah Toy down a hall through his living quarters and into his bedroom, "placed him under arrest and handcuffed him." *Wong Sun*, 371 U.S. at 474, 9 L.Ed.2d at 447. Although a search of Toy's quarters uncovered no narcotics, Toy, in response to questions from the officers, made a number of incriminating statements. The court held that verbal evidence which derives immediately from an unlawful entry and an unauthorized arrest "is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Id.* at 485-86, 9 L.Ed.2d at 454. In cases like that of *Wong Sun*, suppression of tainted evidence turns on " 'whether, granting establishment of the primary illegality, the evidence to which . . . objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.* at 488, 9 L.Ed.2d at 455 (quoting Maguire, Evidence of Guilt, 221 (1959)).

We note initially that the State did not appeal the trial court's order of 14 March 1989, concluding *inter alia* that the officers' search warrant was invalid as to the defendant's house. Thus the law of the case is that the officers did not have probable cause to search the defendant's house, and they entered it illegally. The defendant was confined to a single area soon after the officers entered her home. Moreover, she was kept continuously in the presence of one or more officers, and at no time was she free to leave. Bearing in mind that there is rarely if ever a litmus test "for determining when a seizure exceeds the bounds of an investigative stop," *Florida v. Royer*, 460 U.S. 491, 506, 75 L.Ed.2d 229, 242 (1983), we conclude that the defendant was arrested when, or very shortly after, the officers entered her home. *INS v. Delgado*, 466 U.S. 210, 215, 80 L.Ed.2d 247, 255 (1984) (seizure within the

meaning of the Fourth Amendment occurs "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.") The officers who arrested Mrs. Allen had information implicating her husband in a marijuana growing scheme, but they had no information about her. Thus, she was arrested without probable cause.

Following the defendant's motion to suppress her statements and *voir dire* testimony of Agent Bazemore, the trial court made findings of fact and conclusions of law. It concluded that after the "discovery of the marijuana growing operation in the barn adjacent to the defendant's residence ample probable cause existed for her arrest . . . ; that none of the constitutional rights, Federal or State, of the defendant were violated by the entry into her residence, by her arrest, by her detention, by her interrogation or by the statement made by her to Special Agent Bazemore . . . ." Upon a motion to suppress inculpatory statements, findings of fact, supported by competent evidence, are binding and conclusive; the "trial court's conclusions of law, however, are fully reviewable by appellate courts." *State v. Corley*, 310 N.C. 40, 52, 311 S.E.2d 540, 547 (1984); *accord, State v. Simpson*, 314 N.C. 359, 368, 334 S.E.2d 53, 59 (1985).

The trial court included the following statement in its findings of fact: "although not 'formally' arrested until some time considerably later in the day Mrs. Allen was deprived of her liberty shortly after the arrival of the officers and the discovery of the ongoing growing operation." In its conclusions the trial court did not expressly state when, for Fourth Amendment purposes, Mrs. Allen was arrested. The trial court's conclusions imply, however, that Mrs. Allen was arrested only after the search of the barn. Assuming, without deciding, that probable cause to arrest Mrs. Allen existed after marijuana was discovered growing in the barn, her arrest inside her house without a warrant was fatally defective under the Fourth Amendment.

In *Payton v. New York*, the United States Supreme Court reiterated, as " 'a basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." 445 U.S. 573, 586, 63 L.Ed.2d 639, 651 (1980). Warrantless arrests in public places are valid, but

"[t]o be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity

STATE v. ALLEN

[102 N.C. App. 598 (1991)]

of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present."

*Id.* at 588, 63 L.Ed.2d at 652 (quoting *United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978), *cert. denied sub nom. Goldsmith v. United States*, 439 U.S. 913, 58 L.Ed.2d 259 (1978)).

This Court was required to apply *Payton* in *State v. Yananokwiak*, 65 N.C. App. 513, 309 S.E.2d 560 (1983). The facts of *Yananokwiak* involved the arrest of one Mark Klouda for sale of cocaine. Klouda agreed to help officers arrest his drug supplier, a man he identified as Mark Yananokwiak. Klouda, equipped with a concealed microphone, entered the defendant's home. Police

heard Klouda say, "they want another ounce; here's your money," followed by the sounds of someone counting money and shaking something. Police next heard Klouda ask, "[i]s that enough for a whole ounce? Is it as good as the other stuff? . . . What's that?" A voice identified as defendant's responded, "[the] [c]ut."

The waiting undercover agents then rushed into the kitchen of defendant's home, where they found defendant bending over a scale, mixing white powder with a playing card. Defendant was arrested and, after about five minutes, agreed to permit officers to search the home, resulting in the discovery of drugs and paraphernalia in a back bedroom.

*Id.* at 514, 309 S.E.2d at 561. Noting that several hours elapsed between Klouda's arrest and the police's entry of the defendant's home, "giving them ample time in which to obtain a warrant," the Court held that "there was insufficient evidence of exigent circumstances to excuse the warrantless entry into defendant's home." *Id.* at 515, 517, 309 S.E.2d at 562-63.

Our Supreme Court has noted that "it appears to be the essence of 'exigent circumstances' that there was 'the lack of time to obtain a warrant without thwarting the arrest or making it more dangerous.' " *State v. Johnson*, 310 N.C. 581, 586, 313 S.E.2d 580, 583 (1984) (quoting Latzer, Enforcement Workshop: Police Entries to Arrest — *Payton v. New York*, 17 Crim. L. Bull. 156, 165 (1981)). Although it is difficult to state a general rule regarding exigent circumstances which may excuse a warrantless entry, among the important factors courts consider are the following: (1) hot pursuit

of a suspect, *see, e.g., United States v. Santana*, 427 U.S. 38, 49 L.Ed.2d 300 (1976); (2) likelihood that the suspect will escape if entry is delayed, *see, e.g., State v. Wallace*, 71 N.C. App. 681, 323 S.E.2d 403 (1984), *disc. review denied*, 313 N.C. 611, 332 S.E.2d 82 (1985); and (3) danger to law enforcement officers or the public if entry is delayed, *see, e.g., Warden v. Hayden*, 387 U.S. 294, 18 L.Ed.2d 782 (1967). In the case below none of those factors was present. The house had been secured, the defendant, at the least, was being detained while investigation of the barn proceeded, and no danger to the officers or the public would have been presented by delaying the arrest of defendant long enough to obtain a warrant.

As an alternative basis to support its denial of the defendant's motion to suppress her statements, the trial court concluded "that if the statements made to Special Agent Bazemore were deemed to be 'fruit of the poisonous tree' the effect of any unlawful conduct by the officers was sufficiently attenuated by intervening events, including both [*sic*] the passage of time, the arrival of female officers, the arrival of the defendant's husband, permitting the defendant to bathe and dress," to break the connection between the illegal conduct and the defendant's inculpatory statements. The court concluded further that the defendant's statements, given after the *Miranda* warnings, were "made freely, voluntarily, and understandingly." We agree.

In *Brown v. Illinois*, the United States Supreme Court supplemented the "principles to be applied where the issue is whether statements and other evidence obtained after an illegal arrest or search should be excluded." 422 U.S. 590, 597, 45 L.Ed.2d 416, 423 (1975). The defendant in *Brown* had been arrested in violation of the Fourth Amendment; however, the Supreme Court of Illinois held that "the giving of the Miranda warnings [to defendant] . . . served to break the causal connection between the illegal arrest and the giving of the statements [by defendant]." 56 Ill. 2d 312, 317, 307 N.E.2d 356, 358 (1974). In overruling the Illinois judgment, the United States Supreme Court held:

> If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, . . . the effect of the exclusionary rule would be substantially diluted. Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that

evidence derived therefrom could well be made admissible at trial by the simple expedient of giving Miranda warnings. . . .

\* \* \* \*

. . . The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive. . . . The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, see *Johnson v. Louisiana,* 406 US 356, 365, 32 L Ed 2d 152, 92 S Ct 1620 (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Brown,* 422 U.S. 590, 602-04, 45 L.Ed.2d 416, 426-27.

Upon review of the facts in the case below in light of the factors pronounced in *Brown v. Illinois,* we conclude that defendant's statements to Agent Bazemore were not the product of defendant's earlier illegal arrest. Approximately an hour and a half elapsed between the illegal intrusion into defendant's home and the giving of her statements. Although she was held separately from her husband, not allowed to speak with him, and was in the presence of one or more officers most of the time, she was permitted to bathe and change clothes in private. On the date of her arrest, defendant was 35 years old and licensed as a Registered Nurse. There is nothing in the record showing any misconduct on the part of the officers or intent to violate the defendant's rights. We hold the trial court correctly held the defendant's statements were freely, voluntarily and understandingly made after the giving of the *Miranda* warnings and were not the fruit of the illegal arrest.

[2] We next consider defendant's argument that the trial court erred by denying her motion at the close of all evidence to dismiss the charge of knowingly maintaining a building used for the keeping of marijuana. "[W]hile not conceding the sufficiency of the evidence of knowledge, . . . [the defendant] chooses to concentrate her argument on the sufficiency of the evidence of keeping or maintaining." She contends that the only act which constituted evidence of "keep-

ing or maintaining" the barn was her payment of electric utility bills. We disagree.

Violation of the statute at issue is a misdemeanor, unless the State alleges and proves "that the violation was committed intentionally," in which case the offense is a Class I felony. N.C. Gen. Stat. § 90-108(b) (1990). The defendant was convicted of a misdemeanor violation, the elements of which are (1) knowingly keeping or maintaining (2) a building, vehicle, or other place (3) being resorted to by persons unlawfully using controlled substances, or being used for unlawfully keeping or selling controlled substances. N.C. Gen. Stat. § 90-108(a)(7) (1990). Upon a motion to dismiss a criminal charge, all the evidence admitted must be considered in the light most favorable to the State, and the State must be given the benefit of every reasonable inference that could be drawn from the evidence. *State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984). The trial court must then "decide whether there is substantial evidence of each element of the offense charged." *Id.*

Maintain means to "bear the expense of; carry on . . . hold or keep in an existing state or condition." Black's Law Dictionary 859 (5th ed. 1979). As this Court noted in *State v. Alston*, § 90-108(a)(7) "does not require residence, but permits conviction if a defendant merely keeps or maintains a building for the purpose of keeping or selling controlled substances." 91 N.C. App. 707, 711, 373 S.E.2d 306, 310 (1988). In *State v. Locklear*, the defendant was convicted of keeping or maintaining a dwelling for keeping or selling controlled substances and with keeping or maintaining a vehicle for keeping or selling controlled substances, and this Court held

> whether or not defendant lived in or owned the trailer is relevant to the element of the crime that defendant "keep or maintain" the dwelling for unlawful purposes . . . . Likewise, the evidence as to title and ownership of the vehicle would help to establish whether or not defendant "kept or maintained" the vehicle for unlawful use . . . .

84 N.C. App. 637, 643, 353 S.E.2d 666, 670 (1987).

In the case below, in addition to the defendant's inculpatory statements, the State presented evidence that (1) the defendant and her husband held title to the property on which the barn was situated; (2) the defendant obtained the building permit for the barn; (3) the defendant contacted the tax collector for Washington

STATE v. ALLEN

[102 N.C. App. 598 (1991)]

County to find out whether "it [the barn] could be listed in her name on a separate listing"; (4) electric power to the house and barn was metered separately; (5) the charges for the barn (in February, March, and April of 1988) were $7.34, $8.11, and $28.36, while charges for the house were $139.02, $119.30, and $127.92, respectively, yet in August, September, and October of 1988 charges for the barn were $182.61, $246.89, and $200.36, while those for the house were $218.58, $198.75, and $123.42; and (6) during the period 12 February 1988 through 13 September 1988, the defendant paid the electric utility bill with checks drawn on a joint bank account with her husband. This Court has held that a "person knows of an activity if he is aware of a high probability of its existence." *State v. Bright*, 78 N.C. App. 239, 243, 337 S.E.2d 87, 89 (1985), *disc. review denied*, 315 N.C. 591, 341 S.E.2d 31 (1986). We hold that the trial court below correctly concluded there was sufficient evidence of each element of the offense charged to allow the case to go to the jury.

The defendant's remaining assignment has been reviewed and found to be without merit.

No error.

Judge LEWIS concurs.

Judge WELLS dissents.

Judge WELLS dissenting.

I believe that defendant's statements to Agent Bazemore were the result of the illegal entry into her home. The majority's conclusion that she was wrongfully arrested either at that time or shortly thereafter strengthens my opinion that these statements were improperly obtained, and are tainted by these improprieties. I am not convinced that those factors relied on by the trial court and cited by the majority purge these statements of the primary taint. Therefore, I vote to grant a new trial.