STATE OF NORTH CAROLINA v. SHEILA MARIE BURNS PERDUE

No. 447A86

(Filed 7 July 1987)

1. **Homicide § 21.5— murder of child by mother—evidence of corpus delicti—sufficient**

   In a prosecution of defendant for the murder of her one-month-old child, there was sufficient evidence that the child's death resulted from the criminal agency of another where the emergency room physician who examined the infant at the hospital testified that she had sustained profound head injury indicating fracture of the skull bones; that it is hard to fracture a child's bones, including the skull; that "simple injuries such as falling from a stand or being dropped accidentally is very uncommon to bruises and fractures"; and the medical examiner testified that it would take a rather considerable amount of torsion or force to cause the fractures he observed during the autopsy of the victim. *State v. Byrd*, 309 N.C. 132, is distinguishable because here there was observable external trauma to the victim, there was evidence that defendant had exclusive care of the child on the day the infant died, and there was evidence that the fractures were likely sustained very close to the time of death and that the victim probably lived for only a short time after receiving the head injury.

2. **Homicide § 21.5— murder of child by mother—evidence sufficient**

   The State presented sufficient evidence of premeditation and deliberation, as well as malice, in the prosecution of a mother for the murder of her child where the victim, a helpless thirty-day-old child, had no opportunity to legally provoke the defendant; the defendant displayed erratic conduct after the death of her daughter; several witnesses testified that defendant had an odor of alcohol on her breath; an emergency room doctor and paramedics testified that

State v. Perdue

the victim had a bruised and battered look, including swelling over the back of the skull; and evidence of blood spattered on defendant's shirt and in the child's bedroom also supported the conclusion that the victim met a violent and brutal death.

**3. Criminal Law § 75.15— confession—obtained while defendant tranquilized—admissible**

The trial court did not err in the prosecution of defendant for the murder of her infant daughter by admitting an incriminating statement made by defendant after an injection of Haldol, a tranquilizer, where defendant was coherent and was not dream-like or trance-like, did not become drowsy until after the statement had been signed, and presented no medical evidence on the motion to suppress.

**4. Criminal Law § 102.9— murder of infant—prosecutor's argument concerning good parent—no error**

The trial court did not err in a prosecution for the murder of defendant's infant daughter by allowing the prosecutor to comment in his closing argument as to what a good parent would do when confronted by an officer investigating her infant's death. The argument was in response to defense counsel's statement that defendant was a good mother and was supported by evidence that defendant kicked at paramedics when told that she needed to go to the hospital and used profanity and voiced threats to officers and ambulance drivers at her home.

**5. Criminal Law § 102.7— murder—prosecutor's argument on credibility of serologist—no error**

The trial court did not err in a murder prosecution by admitting the prosecutor's argument regarding the credibility of the serologist where defense counsel had attacked the credibility of the serologist.

**6. Criminal Law § 102.6— murder—prosecutor's closing argument—explanation of why witness not called—no error**

It was not improper for the prosecutor to state during closing arguments in a murder prosecution that he wouldn't have called defendant's husband for the world where the statement was made in response to the defense counsel's remark that it was significant that defendant's husband had not been called.

**7. Homicide § 14.3— murder of infant—instruction on malice—no error**

The trial court did not err by instructing the jury that malice could be inferred from an attack by hand without other weapons when the attack was made by a mature man or woman against an infant where there was firm evidence that the victim died from a "blunt impact" received shortly before death and that her death was not likely the result of accident or self-inflicted wounds; defendant had nearly exclusive care of the child on the day the death occurred; and the fatal blows received by the victim likely occurred a very short time, perhaps a minute, before death.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment entered on 10 April 1986, by *Ross, J.,* imposing a life

sentence upon defendant's conviction of first-degree murder, returned at the 7 April 1986 Criminal Session of Superior Court, DAVIDSON County. Heard in the Supreme Court 11 May 1987.

On 8 July 1985, defendant was indicted for the first-degree murder of her infant daughter. On 12 December 1985, Judge Joseph R. John ordered that there was insufficient evidence of aggravating factors to warrant submission of the death penalty. The case was tried before a jury, and defendant was found guilty of first-degree murder.

*Lacy H. Thornburg, Attorney General, by William P. Hart, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Robin E. Hudson, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

In this appeal from her conviction of first-degree murder of her infant daughter, defendant argues: (1) that the evidence was insufficient to support a conviction of first-degree murder, (2) that the court erred in admitting her inculpatory statement into evidence, (3) that the court erred in overruling defendant's objections to the district attorney's closing argument, and (4) that the court erroneously instructed the jury on the element of malice. We find no error.

In March 1985, defendant, Sheila Perdue, lived in a mobile home with her husband, Homer Perdue, and their thirty-day-old infant daughter, Tammy Maranda Perdue. According to the testimony of Homer Perdue, on 11 March 1985 at approximately 2:10 p.m., he was working at Lott Steel and received a call from the defendant, who reported that there was something wrong with their daughter. He drove to their mobile home and there he saw the defendant holding Tammy, who appeared white and lifeless. Perdue rushed to his father's mobile home, just next to his, and called an ambulance. He then went back to his mobile home and tried to perform cardiopulmonary resuscitation on the child.

In response to Perdue's call, paramedics and Davidson County sheriff's deputies came to the Perdue mobile home. Harvey Blackwelder, a paramedic, testified that when he arrived at the mobile home, he was met by Jerry Sink of the rescue squad. Sink,

who had Tammy in his arms, laid her on the ambulance cot. Black-welder testified that when he observed the infant, she had no vital signs. Blackwelder also testified that the infant had blood on her face, lacerations on the bridge of her nose, and abrasions around her left eye. He testified that there was bruising on the chest, abdomen, and face of the infant.

Both defendant and Tammy were transported by ambulance to Lexington Memorial Hospital. While there, the defendant was observed by law enforcement personnel, as well as the emergency room physician, who testified that her behavior was erratic; she acted at times calm and at other times hysterical. Pursuant to a nontestimonial identification order, defendant's blood was drawn.[1] Before being taken to the Sheriff's Department for questioning, she was injected with five milligrams of Haldol, a tranquilizer.

While at the Sheriff's Department, defendant waived her *Miranda* rights and gave the following statement, which was offered into evidence by the State:

About 6:30 a.m. my father-in-law (BOBBY EUGENE PER-DUE) came to our trailer to awaken my husband so that he could go to work. I didn't get up at that time. Sometime later, my father-in-law came back to ask me if I was going to come over to his trailer, which is behind ours, and watch television. That was sometime around nine a[.]m. I'm not sure of the exact time because our clock broke the night before. Anyway, I went over to my father-in-law's and took Tammy with me. She was sleeping. Before I left I fed her two ounces of milk (my trailer). Tammy slept while I was at my father-in-law's. I watched TV with my father-in-law. I don't know what time I left there but we were watching an old movie and it wasn't over when I did leave. The baby was still asleep. When I got back to my trailer Tammy was awake so I fed her 1½ ounces of milk. After she took the milk she burped and blood came out of her mouth all over me. I laid her down and went back to my father-in-law's and used his phone to call my husband (HOMER RAY PERDUE) at his job at Lott Steel. I didn't have a phone and that's why I had to leave my

1. The lab report indicated that defendant's blood had an ethyl alcohol content of .17 percent. Neither the report itself nor the results thereof were offered as evidence.

baby and go to the other trailer to call my husband. I went back to my trailer and about three seconds after I got there my father-in-law came in. The baby was okay but still bleeding from the mouth. The baby has been constipated and I've taken it to the doctor for that. The only marks I noticed were where it looked like she grabbed for her mouth and scratched her face. She slept well last night; she awakened about 4 a.m. and I got up. I changed her diaper, fed her, and then she went right back to sleep. I didn't hurt Tammy and I don't know who did.

The State's medical evidence was based on the testimony of Dr. Mark Bordou, the emergency room physician who examined the infant when she arrived at the hospital, and Dr. Page Hudson, the State's Chief Medical Examiner.

Dr. Bordou testified that he examined Tammy on 11 March 1985, in his capacity as emergency room physician and medical examiner. He testified that the child had a bruised and battered appearance and that there was general swelling about her face. He further testified that the most profound injuries were on the infant's head and that there was a "tremendous amount of swelling over the back of the skull and discoloration which indicated blood about the surface of the scalp."

Dr. Page Hudson, a forensic pathologist and the State's Chief Medical Examiner, performed an autopsy on Tammy Maranda Perdue on 12 March 1985. He observed extensive bruising to the chest, hand, and head. He observed a fresh fracture on the left arm, a fresh fracture of the left leg, and extensive fracturing of the skull. He opined that it would take a rather considerable amount of torsion or force to cause the leg and arm fractures and that these fractures occurred rather close to the time of death. He also testified that the skull fracture was likely the result of "considerable blunt force injury." He offered his opinion that Tammy Perdue died as a result of a blunt force injury to the head and could have lived for only a short time after sustaining such an injury.

Paramedics and Davidson County sheriff's deputies testified that in defendant's mobile home they observed bloodstains on a baby carrier, baby carrier cover, disposable diaper box cover, and blanket in the crib. In the bathroom, they observed reddish stains

on the shower stall, under the sink, and on the carpet. They also observed reddish stains on a mattress on a bed in the end bedroom and on a pair of white shorts found on the floor in the kitchen. Paramedics who observed defendant outside her mobile home noticed that she wore a shirt and pants that appeared to have been bloodstained.

Jona Medlin, a chemist with the State Bureau of Investigation, testified that she examined the samples of blood of defendant and Tammy Perdue. After analysis of the baby carrier, defendant's shirt and pants, and the white shorts found on the floor of the kitchen, she offered her opinion that human blood was present on the items analyzed and that the blood was consistent with the blood of the infant.

Defendant offered the testimony of several witnesses who said they had observed her with her baby daughter prior to the death and that she had been a good parent. They testified that she had strict rules about not holding the baby too long or smoking around the baby.

I.

[1] By her first argument, defendant contends that the trial court erred in entering judgment because the evidence was insufficient to support a conviction of first-degree murder. Specifically, defendant argues that the State proved neither the *corpus delicti* of the crime nor the requisite criminal intent necessary to support a conviction of first-degree murder. We disagree.

The *corpus delicti* of murder includes proof of death and proof that the death resulted from the criminal agency of another. *State v. Johnson*, 193 N.C. 701, 138 S.E. 19 (1927). Evidence of "criminal agency of another," as that phrase has been used in defining *corpus delicti* in homicide cases, means evidence which tends to show that the deceased died not as a result of natural or accidental causes, but by the hand of another. *Jefferson v. State*, 128 So. 2d 132 (Fla. 1961). *See generally* R. Perkins, *The Corpus Delicti of Murder*, 48 Va. L. Rev. 173 (1962).

Defendant argues that because the expert medical testimony did not expressly exclude an accidental cause of death, the State failed to prove that the death resulted from the criminal agency of another. We disagree.

Dr. Bordou testified that the victim sustained profound head injury indicating fracture of the skull bones. He opined that it is hard to fracture a child's bones, including the skull, and that "simple injury such as falling from a stand or [being] dropped accidentally is very uncommon to bruises and fractures." Dr. Hudson testified that it would take "a rather considerable amount of torsion or force" to cause the fractures he observed during the autopsy of the victim. We hold that this evidence was sufficient to permit a jury to find that the victim's injuries were not the result of accident and that the *corpus delicti* was established.

Defendant's reliance on *State v. Byrd*, 309 N.C. 132, 305 S.E. 2d 724 (1983), is misplaced. There, defendants were convicted of second-degree murder of their infant son. The pathologist who performed the autopsy on the victim observed no external injury. After an order of exhumation, the victim's body was examined by a state medical examiner, who testified and offered an opinion that the child victim died as a result of a "blunt trauma" to the head. The medical examiner also offered his opinion that a twenty-five-day-old child could not sit up, crawl, or turn over. This Court held that while the testimony was some evidence that the child did not accidentally cause injuries to *himself*, it was not "tantamount to a statement that *another* person could not have, or was unlikely to have, accidentally inflicted the injuries." *Id.* at 138-39, 305 S.E. 2d at 729.

*Byrd* is readily distinguishable from the present case. Here, paramedics, the emergency room doctor, and the state medical examiner all observed external trauma to the victim; in *Byrd* there was no observable trauma. In the present case, there was evidence that the defendant had exclusive care of the child on the day the infant died; in *Byrd* there were three other adults, living in the Byrd household, who had the opportunity to inflict the injuries. In the present case, Dr. Hudson testified that the fractures he observed on the victim were likely sustained very close to the time of death and that the victim probably lived for only a short time, perhaps a minute, after receiving the head injury; in *Byrd* it was not clear when the child sustained injuries resulting in death.

[2] In addressing defendant's contention that there was insufficient evidence of premeditation and deliberation and of malice, we are guided by well-developed legal principles.

First-degree murder is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Strickland*, 307 N.C. 274, 298 S.E. 2d 645 (1983). Premeditation means that defendant formed the specific intent to kill the victim for some period of time, however short, before the actual killing. *State v. Misenheimer*, 304 N.C. 108, 282 S.E. 2d 791 (1981). Deliberation is an intention to kill, executed by defendant in a cool state of blood, in furtherance of a fixed design to accomplish some unlawful purpose. *State v. Robbins*, 275 N.C. 537, 169 S.E. 2d 858 (1969). Malice is a condition of mind that prompts one to take the life of another intentionally, without just cause, excuse, or justification. *State v. Robbins*, 309 N.C. 771, 309 S.E. 2d 188 (1983).

This Court has repeatedly held that premeditation and deliberation are rarely susceptible to direct proof and must usually be shown by circumstantial evidence including (1) lack of provocation by the victim, (2) the conduct and statements of the defendant before and after the killing, (3) threats and declarations by the defendant before and during the course of the occurrence giving rise to the death of the deceased, (4) dealing of lethal blows after the deceased has been felled and rendered helpless, and (5) evidence that the killing was done in a brutal manner. *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837 (1984). Likewise, malice may be inferred from the use of a deadly weapon, *State v. Lang*, 309 N.C. 512, 308 S.E. 2d 317 (1983), or the willful blow by an adult on the head of an infant, *State v. West*, 51 N.C. (6 Jones) 505 (1859).

Applying the foregoing principles to the facts, we hold that the State presented sufficient evidence to prove premeditation and deliberation, as well as malice. The victim, a helpless thirty-day-old child, had no opportunity to legally provoke the defendant. The defendant displayed erratic conduct after the death of her daughter; several witnesses testified that she had an odor of alcohol on her breath. An emergency room doctor, as well as paramedics, testified that the victim had a bruised and battered appearance, including a swelling over the back of the skull. That the victim met a violent and brutal death was also supported by the evidence of blood spattered on defendant's shirt and in the child's bedroom. We hold that this evidence supports a finding of premeditation and deliberation, as well as malice.

## II.

[3] Defendant next argues that the trial court erred in admitting into evidence defendant's statement to police. Specifically, defendant argues that she did not possess the requisite mental capacity to make an intelligent and voluntary waiver of her rights prior to giving an inculpatory statement.

In determining the voluntariness of the confession, we look to the totality of the circumstances. *State v. Massey*, 316 N.C. 558, 342 S.E. 2d 811 (1986). The trial court is to determine whether the State has borne its burden of showing, by a preponderance of the evidence, that defendant's confession was voluntary. *State v. Corley*, 310 N.C. 40, 311 S.E. 2d 540 (1984). The factual findings by the trial court are binding on appeal if supported by competent evidence; however, conclusions of law are fully reviewable. *Id.*

On voir dire, the court heard the testimony of Officer Bass, who observed the defendant at the time she waived her *Miranda* rights and gave a statement to police. Among its findings of fact, the court found that at approximately 5:20 p.m., the defendant was injected with five milligrams of Haldol, a tranquilizer. The court found that during the subsequent waiver of rights and statement to police, defendant was coherent and "was not dreamlike or . . . transe-like [sic]; [she] did not become drowsy until after the statement had been taken, recorded and signed."

Based on these findings, the court concluded that defendant's statement to Officer Bass was freely made and that defendant knowingly and voluntarily waived her constitutional rights to remain silent and to the assistance of counsel.

Defendant argues that the evidence does not support the court's conclusion that the statement was voluntary. She argues that because her will was overborne by the effects of the Haldol injection, her incriminating statement was not truly voluntary.

It is well settled that the fourteenth amendment guarantee of due process protects against the admission of a defendant's confession which is not truly voluntary and the product of a free will and rational intellect. *Townsend v. Sain*, 372 U.S. 293, 9 L.Ed. 2d 770 (1963); *Blackburn v. Alabama*, 361 U.S. 199, 4 L.Ed. 2d 242 (1960). This Court has held that a defendant's intoxication at the time of confession does not preclude the conclusion that a defend-

ant's statements were freely and voluntarily made. *State v. Parton*, 303 N.C. 55, 277 S.E. 2d 410 (1981), *overruled on other grounds, State v. Freeman*, 314 N.C. 432, 333 S.E. 2d 743 (1985). In *Parton*, an officer who arrested defendant testified that although defendant was intoxicated, he was not staggering and appeared coherent. We held that based on this testimony, the trial court properly found a free and voluntary waiver of *Miranda* rights. *See* Annot. "Sufficiency of Showing that Voluntariness of Confession or Admission was Affected by Alcohol or Other Drugs," 25 A.L.R. 4th 419 (1983 and Supp. 1986).

Defendant argues that while there are no cases directly on point, the most closely analogous case from another jurisdiction is *In re Cameron*, 68 Cal. 2d 487, 439 P. 2d 633, 67 Cal. Rptr. 529 (1968), where defendant became hysterical during police questioning and was then taken to a hospital where he was given an injection of three hundred milligrams of Thorazine. There, the court held that defendant's confessions were inadmissible because the Thorazine destroyed anxiety and made him amenable to the wishes of others.

In the present case, although no medical evidence was presented on the motion to suppress, defendant requests that we examine the medical literature to find that the effects of Haldol in the present case approximate the effects of Thorazine in the *Cameron* case. We decline defendant's invitation to engage in a *de novo* medical analysis of the effects of Haldol on a particular defendant. However, we note parenthetically that our research discloses no case in which an appellate court has found that the effects of Haldol rendered a confession involuntary. *See People v. Kincaid*, 87 Ill. 2d 107, 429 N.E. 2d 508 (1981), *cert. denied*, 455 U.S. 1024, 72 L.Ed. 2d 144 (1982) (confession made two hours after receiving five-milligram dose of Haldol); *People v. Madden*, 148 Ill. App. 3d 988, 501 N.E. 2d 1297 (1986), *appeal denied*, 113 Ill. 2d 581, 505 N.E. 2d 358 (1987) (confession voluntary, notwithstanding injection of Haldol); *State v. Jones*, 386 So. 2d 1363 (La. 1980) (expert testified that Haldol does not lower inhibitions; defendant's statement, one day after drug administered, properly found to be voluntary). *But cf. State v. Porter*, 122 Ariz. 458, 595 P. 2d 1003 (Ariz. App. 1978) (defendant took Haldol two hours prior to arrest; trial court erred in failing to instruct jury on voluntariness of confession).

Based on the aforementioned, we find the trial court did not err in admitting defendant's incriminating statement.

## III.

Defendant next argues that the trial court erred in overruling defendant's objections to the district attorney's closing argument. First, defendant contends that the district attorney made an improper remark as to what a "good parent" would do when confronted by an officer investigating her infant's death. Second, defendant argues that the district attorney improperly commented on the credibility of witnesses. Finally, defendant argues that it was improper for the district attorney to explain why he did not call defendant's husband as a witness.

[4] It is well settled that counsel is allowed wide latitude in arguing to the jury facts in evidence and all inferences to be drawn therefrom. *State v. Covington*, 290 N.C. 313, 226 S.E. 2d 629 (1976). It is within the trial judge's discretion to determine whether counsel has exceeded the freedom allowed in the argument of hotly contested cases, and this Court will not review the judge's exercise of discretion unless there exists such gross impropriety in the argument as would likely influence the jury's verdict. *State v. Hockett*, 309 N.C. 794, 309 S.E. 2d 249 (1983).

Defendant argues that the trial court erred in not sustaining her objection to the following argument:

[W]ould you kick at the officers when they came out to help you with the case, to find out what was going on, would you curse at them? Not if you are a good parent and you know that. If you loved your child and you didn't hurt that child you would have wanted everybody around to do as much as they could as quick as they could to find out what did happen.

The argument was a response to defense counsel's statement that there was uncontradicted evidence that defendant was a good mother. This Court has often held that a prosecutor may respond to arguments offered by defense counsel. *See, e.g., State v. Gladden*, 315 N.C. 398, 340 S.E. 2d 673, *cert. denied*, --- U.S. ---, 93 L.Ed. 2d 166 (1986) (defense counsel "opened the door" to argument that witness was not truthful).

Moreover, the facts belie defendant's argument that the district attorney's comments misstated the evidence. A paramedic who arrived at defendant's mobile home testified that when defendant's husband informed her that she needed to go to the hospital, the defendant indeed kicked at him and at the paramedic. Likewise, Franklin Godby, a Davidson County Deputy Sheriff, testified that defendant used profanity and voiced threats to officers and ambulance drivers at her home. Accordingly, we find that the court did not err in overruling defendant's objection to this portion of the district attorney's argument.

[5] Defendant also maintains that the court erred in overruling her objection to the district attorney's statement regarding the credibility of the serologist, who had testified that the bloodstains in the defendant's clothing were consistent with the victim's blood. The district attorney stated:

I askedher [sic] in each category if she tested enough things to form an opinion whether the blood she found on those items was consistent with this child's blood and she said YES. If she didn't, she wouldn't have told you that, Members of the Jury.

Defendant argues that the district attorney traveled outside the record and argued his own beliefs and personal opinion to the jury. Of course counsel is not permitted to express his personal beliefs as to the credibility of witnesses. *State v. Black*, 308 N.C. 736, 303 S.E. 2d 804 (1983). However, counsel is allowed to respond to arguments made by defense counsel and restore the credibility of a witness who has been attacked in defendant's closing argument. *State v. McCall*, 289 N.C. 512, 223 S.E. 2d 303, *vacated on other grounds*, 429 U.S. 912, 50 L.Ed. 2d 278 (1976).

We have examined the record and find that during closing argument, defendant's counsel attacked the credibility of the serologist and urged the jury to apply to her testimony the "Latin phrase: *Falsius in unum; falsius in totem* [sic]—(false in one part, false in totality)." The district attorney's argument was a legitimate response to that attack.

[6] Finally, we find no merit in defendant's argument that it was improper for the district attorney to state, with respect to defendant's husband: "I wouldn't have called him as a witness for

the world!" We find that the district attorney's statement was made in response to defense counsel's remark, during closing argument, that it was "significant that the State did not call him [Homer Perdue] as a witness." We have previously held that the district attorney may respond to such statements that call into question the failure of the State to call a witness. *State v. Abdullah*, 309 N.C. 63, 306 S.E. 2d 100 (1983) (proper for State to explain, in response to defense counsel questioning why certain witness was not called to testify, that proposed witness had a sordid past).

## IV.

[7] In her final argument to this Court, defendant argues that the trial court erred in instructing the jury on the element of malice. In pertinent part, the court charged the jury:

> Malice may be implied from evidence that the victim's death resulted from attack by hand alone without the use of other weapons when the attack was made by a mature man or woman upon a defenseless infant.

Defendant argues that because there was no evidence as to how the injuries were sustained, the jury should not have been permitted to infer malice.

Where an adult has exclusive custody of a child for a period of time and during such time the child suffers injuries which are neither self-inflicted nor accidental, the evidence is sufficient to create an inference that the adult inflicted an injury. *State v. Riggsbee*, 72 N.C. App. 167, 323 S.E. 2d 502 (1984) (child abuse case; held that where defendant had sole custody of child at time of injury, coupled with evidence that injury was not accidental, evidence supported inference that defendant intentionally caused fracture to child's arm); *State v. Loss*, 295 Minn. 271, 204 N.W. 2d 404 (1973) (manslaughter; jury could infer that adult with custody inflicted fatal blows); *Commonwealth v. Paquette*, 451 Pa. 250, 301 A. 2d 837 (1973) (no eyewitness to alleged beating; fact finder justified in rejecting theory of accidental injury where bruising occurred while child was in exclusive care of defendant); *State v. Durand*, 465 A. 2d 762 (R.I. 1983) (manslaughter; jury could infer that custodial adult inflicted injuries where wounds were neither self-inflicted nor accidental).

In the present case, there was firm evidence that the victim died from a "blunt impact" received shortly before death and that her death was not likely the result of accident or self-inflicted wounds. This was sufficient to permit an inference that the infant's death resulted from an attack by human hands. In view of the fact that defendant had nearly exclusive care of the child on 11 March 1985, and testimony that fatal blows received by the victim likely occurred very shortly, perhaps a minute, before death, it was proper to instruct the jury that malice could be inferred from the attack of human hands alone. *State v. West,* 51 N.C. (6 Jones) 505; *State v. Sallie,* 13 N.C. App. 499, 186 S.E. 2d 667, *cert. denied,* 281 N.C. 316, 188 S.E. 2d 900 (1972).

Having found no merit in any of defendant's contentions before this Court, we find that she had a fair trial, free from error.

No error.