**STATE v. MAHATHA**

[157 N.C. App. 183 (2003)]

STATE OF NORTH CAROLINA v. SAMUEL EMANUEL MAHATHA, Defendant

No. COA02-322

(Filed 15 April 2003)

## 1. Confessions and Incriminating Statements— voluntariness—waiver of Miranda rights—mental capacity

The trial court did not err in a first-degree murder and robbery with a dangerous weapon case by denying defendant's motion to suppress post-arrest inculpatory statements he made to police even though defendant contends they were made involuntarily and obtained in violation of Miranda, because: (1) four officers who interviewed defendant testified that a Miranda waiver was obtained and the interview was conducted under noncoercive conditions; (2) evidence was presented that defendant understood his Miranda rights and that he was not intoxicated or otherwise impaired when he made his Miranda waiver and statements; (3) the trial court's findings and the evidence permitted a conclusion that defendant had sufficient mental capacity to waive his Miranda rights and voluntarily make inculpatory statements; (4) the totality of circumstances surrounding defendant's post-arrest statements support the trial court's conclusion that the statements were made pursuant to defendant's knowing, intelligent, and voluntary waiver of his Miranda rights including that interrogations of longer duration than the one at hand have been held to be not so lengthy as to render them coercive, defendant made no complaints of being hungry and was provided with drinks and bathroom breaks, the police did not make any threats of physical violence against defendant or promises to him in exchange for his Miranda waiver and statement, and defendant had some familiarity with the criminal justice system; (5) evidence of an officer's deception or trickery leading defendant to mistakenly believe that his fingerprints had been recovered from the victim officer's holster was insufficient standing alone to render defendant's inculpatory statements inadmissible; and (6) the actions of the police in not allowing an attorney to see defendant even though he was appointed by the public defender to represent defendant did not invalidate defendant's Miranda waiver or statements when defendant never requested an attorney.

STATE v. MAHATHA

[157 N.C. App. 183 (2003)]

**2. Criminal Law— competency to stand trial—ability to assist defense in rational or reasonable manner**

    The trial court did not err in a first-degree murder and robbery with a dangerous weapon case by denying defendant's pretrial motion under N.C.G.S. § 15A-1001 that he be declared incompetent to stand trial even though defendant contends he was unable to assist in his defense in a rational or reasonable manner, because: (1) two expert witnesses testified that based on their interviews with defendant and reviews of his test results and school and medical records, they believed that defendant did not suffer from any active mental illness and that he was competent to stand trial; (2) defendant's recitation to a doctor of the key facts of the case against him also supports the conclusion that defendant was able to assist in his defense in a rational and reasonable manner; and (3) contrary to defendant's assertion, the evidence supports the trial court's finding that another doctor did not give an opinion as to defendant's competency to proceed, and therefore, the trial court properly considered his testimony at the competency hearing.

    Appeal by defendant from judgment entered 15 February 2001 by Judge Richard L. Doughton in Mecklenburg County Superior Court. Heard in the Court of Appeals 27 January 2003.

*Attorney General Roy Cooper, by Assistant Attorney General John G. Barnwell, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Barbara S. Blackman, for defendant-appellant.*

ELMORE, Judge.

    On 12 October 1998, defendant Samuel Mahatha was indicted for the murder of Captain Anthony Stancil of the Mecklenburg County Sheriff's Department, and for robbery with a dangerous weapon. Defendant was tried at the 16 January 2001 Criminal Session of Mecklenburg County Superior Court. On 9 February 2001, defendant was found guilty of first-degree murder and robbery with a dangerous weapon. On 15 February 2001, the trial court sentenced defendant to life imprisonment without parole for the murder of Captain Stancil and a consecutive term of imprisonment for a minimum of 103 and a maximum of 133 months for the robbery with a dangerous weapon conviction.

STATE v. MAHATHA

[157 N.C. App. 183 (2003)]

On appeal, defendant contends that the trial court erred in denying his motion to suppress post-arrest inculpatory statements he made to police, which statements defendant contends were made involuntarily and obtained in violation of *Miranda*. Defendant also contends that the trial court erred in finding him competent to stand trial. For the reasons stated herein, we conclude that defendant's trial was free of prejudicial error, and we therefore uphold his convictions and sentence.

The State's evidence tended to show that shortly after midnight on 29 September 1998, defendant and Celeste Davis traveled to the Harris Teeter supermarket on W.T. Harris Boulevard in Charlotte, where Captain Stancil was moonlighting as a security officer. After being in the store for a short time, Davis noticed that defendant had what appeared to be "a package of meat of some kind" concealed in his shirt. Davis then lost sight of defendant and paid for her purchase. As Davis was exiting the store, she ran into Kimberly Nicholson, who told Davis that someone had been shot outside and to call 911. Davis looked outside in the direction where Nicholson was pointing and saw defendant running away from the store, with "something shining in his hand."

Nicholson testified at trial that she had just arrived at the Harris Teeter when she noticed two men in front of the store engaged in a "confrontation" involving a package held by one of the men. As Nicholson approached the store's entrance, she heard a loud shot. She looked back and saw one of the men, later identified as Captain Stancil, on the ground, and the other man standing over him with a gun in his hand. A package of crab legs was on the hood of a nearby car. The man bent over Captain Stancil and then ran through the parking lot away from the store. After approaching Captain Stancil and finding that he did not have a pulse, Nicholson ran into the store, where she encountered Davis. Captain Stancil, who had been shot in the head through the left eye, died at the scene. His service weapon was missing.

After the police arrived, Davis stated that she drove defendant to the store and she thought defendant had killed Captain Stancil. An intensive search for defendant ensued and continued throughout the night. Defendant was arrested at his grandmother's Charlotte home at 10:15 a.m. on 29 September 1998. Defendant had in his possession a brown wallet containing $63.00 in currency and a single Federal .40-caliber bullet, the ammunition type employed by Captain Stancil's service weapon.

A hearing to determine whether defendant was competent to stand trial was held on 1 December 2000. Defendant stipulated that the only issue for determination was whether defendant was able to assist his attorneys in a rational and reasonable manner in providing his defense. The evidence presented at this hearing tended to show that while in elementary school, defendant was placed in a program for educable mentally handicapped children; defendant was later moved into a program for children with behavioral and emotional handicaps, where he remained until dropping out of high school. Defendant's school records reveal performance consistently significantly below grade level for reading comprehension. Defendant's medical records reveal that he contracted bacterial meningitis when he was just over one year old.

At the competency hearing, defendant presented expert testimony from George Baroff, Ph.D ("Dr. Baroff"). Dr. Baroff, who holds a doctorate in clinical psychology and has extensive experience administering intelligence tests to mentally retarded individuals, was admitted as an expert in the area of psychology with an emphasis in the field of mental retardation. Dr. Baroff testified that his testing indicated defendant was seriously mentally retarded with a full-scale IQ of 46, although previous tests had scored defendant's IQ somewhat higher. Dr. Baroff also testified that bacterial meningitis "is associated with significant cognitive impairment" in children. Dr. Baroff testified that he believed defendant lacked the capacity to assist his counsel in a rational and reasonable way in the presentation of his defense. On cross-examination, Dr. Baroff testified that defendant indicated the key facts of this case were the bullet, the witness against him, and the fact that he was at the Harris Teeter on the night Captain Stancil was shot.

Roy Mathew, M.D. ("Dr. Mathew"), a professor of psychiatry and associate professor of radiology at Duke University, also testified for defendant at the competency hearing. Dr. Mathew was admitted as an expert in the field of psychiatry with a specialization in alcohol and substance abuse. Dr. Mathew testified that he was primarily attempting to determine the effect of defendant's alcohol and drug abuse on his mental status, and that due to defendant's failure to cooperate, he was unable to make such a determination. The trial court found that Dr. Mathew did not give an opinion as to whether or not defendant was competent to stand trial.

Nicole Wolfe, M.D. ("Dr. Wolfe"), a forensic psychiatrist at Dorothea Dix Hospital in Raleigh, testified for the State at the com-

petency hearing. Dr. Wolfe was admitted as an expert in forensic psychiatry. Dr. Wolfe testified that she did not believe that defendant was suffering from any active mental illness, nor did she believe defendant was mentally retarded. Dr. Wolfe also testified that she did not believe defendant suffered from any mental disabilities as a result of contracting bacterial meningitis in early childhood.

Mr. Bart Abplanalp ("Abplanalp"), a Postdoctoral Fellow in clinical psychology at Dorothea Dix Hospital, also testified for the State at the competency hearing. Abplanalp conducted psychological testing and performed competency evaluations at Dix and was admitted as an expert in clinical psychology. Abplanalp testified that he administered psychological testing to defendant, including the WASI test, which is a standard test designed to measure intelligence. Abplanalp testified that defendant's results on the WASI test indicated he had a full-scale IQ of 54. Abplanalp testified that defendant's behavior during the WASI test differed notably from defendant's behavior while talking informally with him prior to the test, and that in Abplanalp's opinion, defendant intentionally performed poorly on the test. Abplanalp testified that he believed defendant's school records failed to show any mental retardation. Abplanalp testified that in his opinion, defendant was competent to stand trial. The trial court denied defendant's motion and found defendant competent to proceed.

On 20 December 2000 a hearing was held on defendant's motion to suppress his post-arrest statements. At the suppression hearing, Charlotte-Mecklenburg Police Officer Carmen Mendoza testified that she and Officer Mark Faulkenberry transported defendant to the Law Enforcement Center ("LEC") after his arrest. Officer Mendoza testified that at no point did either she or Officer Faulkenberry initiate any conversation with defendant, but that once defendant was inside the vehicle, defendant "repeatedly asked me about his wallet." During the twenty-two minute ride to the LEC, defendant spoke almost continuously, often in a rhyming or rapping manner and sometimes unintelligibly. Officer Mendoza testified that she never gave a *Miranda* warning to defendant on the way to the LEC because she did not ask him any questions; nor did defendant ever ask for a lawyer or say that he wanted to exercise his right to remain silent. Officer Mendoza testified that defendant exhibited no signs of drug or alcohol impairment.

Evidence presented at the suppression hearing tended to show that upon arrival at the LEC, defendant was taken to a second-floor interview room. Charlotte-Mecklenburg Police Investigator Mark E.

Corwin asked defendant if he wanted anything to eat or drink; defendant declined food but asked for a soft drink, which Officer Corwin immediately procured. At 12:54 p.m., Officer Corwin re-entered the interview room with his colleague, Officer Harold R. Jackson, to find defendant prone on the floor. Both officers testified that defendant did not appear to be asleep, and that defendant showed no signs of intoxication. Defendant got up and sat in a chair when asked to do so by Officer Corwin. Before the officers could begin advising defendant of his *Miranda* rights, and without being asked anything by them, defendant stated that he "[had] not killed anyone . . . I was in the store around 9:00 p.m. Celeste drove me there." At the suppression hearing, Officer Corwin testified that he let defendant finish making this statement and then advised defendant of his *Miranda* rights by going over a standard, printed "waiver of rights" form with defendant. Officer Corwin testified that each of defendant's *Miranda* rights were printed individually on the form; that he read each right aloud to defendant; and that defendant verbally acknowledged that he understood each of his *Miranda* rights. Defendant's initials appear in the space provided on the form beside each of the enumerated *Miranda* rights. Officer Corwin testified that he then had defendant read aloud the following paragraph from the "waiver of rights" form:

> I understand my rights as explained by Officer M.E. Corwin/ H.R. Jackson. I now state that I do wish to answer questions at this time and that I do not wish to have a lawyer here during questioning.

Officers Corwin and Jackson testified that they had no concerns about defendant's level of intelligence and that they believed defendant understood the *Miranda* warnings. Defendant signed the "waiver of rights" form at 1:02 p.m.

For approximately the next two hours, Officers Corwin and Jackson questioned defendant about the murder of Captain Stancil. Officers Corwin and Jackson each testified that at no time did defendant ask for a lawyer or indicate that he wished to terminate the interview. Defendant never complained of being hungry or tired. Neither officer made any promises to defendant. Officer Corwin testified that defendant was never denied a drink or bathroom break, and that defendant took at least one bathroom break during their interview. Defendant never confessed to Officers Corwin and Jackson that he shot Captain Stancil, but he did repeat his earlier statement that he had been at the Harris Teeter with Celeste Davis

the previous night sometime before Captain Stancil was killed. Officer Jackson testified that defendant asked them a series of questions, including whether Davis had mentioned his name; what evidence they had against him; and how much time he could get. Officers Corwin and Jackson ended their interview of defendant at 2:50 p.m. and exited the interview room.

At 3:03 p.m., Sergeant Tom Athey and Officer Tony Rice, who had been observing via video monitor the interview conducted by Officers Corwin and Jackson, began their own interview of defendant. At the suppression hearing, Sergeant Athey and Officer Rice each testified that they had observed Officer Corwin advise defendant of his *Miranda* rights, and that they had no concerns about defendant's intelligence level or ability to understand his rights. Each officer testified that defendant showed no signs of intoxication, and that at no point did defendant ask for an attorney. During their interview, defendant never complained of being tired or hungry. The officers testified that they neither threatened defendant nor made any promises to him during the interview. At the outset of the interview, defendant stated that he knew the policeman had been shot and asked "Where did he get shot, in his eye?" Defendant continued to assert that he had been at the Harris Teeter with Celeste Davis the previous night several hours before Captain Stancil was killed, and that he did not shoot Captain Stancil.

Later in the interview, in response to a series of "true/false" questions asked by Officer Rice, defendant acknowledged that Captain Stancil had confronted him as defendant attempted to leave the store with a package of crab legs concealed under his shirt. Defendant then stated that a gun which defendant had hidden in his sock fell out and discharged, striking Captain Stancil in the head. After Officer Rice questioned the plausibility of defendant's account, defendant stated that the gun was actually hidden in his waistband, and he pulled it out and shot Captain Stancil. Defendant also stated that after shooting Captain Stancil he took the deputy's service weapon and fled. When Officer Rice asked defendant whether he had grabbed Captain Stancil's holster while removing the weapon, defendant stated "So my fingerprints are on the holster," to which Officer Rice replied "Yes," although defendant's fingerprints were never recovered from the holster. Defendant then requested a cup of water.

After a short break, Officer Rice returned with a cup of water and a tape recorder and asked defendant to give a recorded statement. Defendant agreed, and the officers began audio-taping the interview

STATE v. MAHATHA

[157 N.C. App. 183 (2003)]

at 4:27 p.m. This recording was introduced as an exhibit and played at the suppression hearing. When Officer Rice asked defendant to "tell me in your own words what happened out there at the Harris Teeter," the following exchange took place:

> DEFENDANT: No. I don't want to tell what happen [sic] in my own words. It should be right here on the paper [indicating the notes Officer Rice had taken during earlier portions of the interview].
>
> INVESTIGATOR RICE: Do you just want me to read this, is that okay?
>
> DEFENDANT: That will work.

For the next thirteen minutes, Officer Rice proceeded to ask defendant a series of "yes/no" questions based on the notes he had taken earlier in the interview. In his collective responses to these "yes/no" questions, defendant acknowledged the accuracy of his account of pulling a gun from his waistband and shooting Captain Stancil. Defendant also acknowledged ejecting a bullet from Captain Stancil's service weapon and placing it in his wallet. Defendant also stated that he did not mean to shoot Captain Stancil and that after being confronted by the deputy, he was "trying to get away and the gun just went off. I'm seeing if the jury buys that." Sergeant Athey and Officer Rice concluded their interview at 4:40 p.m.

Harold Bender, defendant's trial counsel, testified by affidavit that on 29 September 1998 he agreed to represent defendant in the instant matter pursuant to a request from the public defender. Defendant was unaware of Bender's appointment while he was being questioned. Bender testified that he arrived at the LEC at 1:18 p.m. on 29 September 1998 and asked to see defendant, but was told that he could not. At that time Officers Corwin and Jackson were approximately twenty-four minutes into their interview of defendant. Over the next four hours, while defendant was being interviewed by Officers Corwin and Jackson, and then by Sergeant Athey and Officer Rice, Bender's repeated requests to see defendant were denied.

At the suppression hearing, Officer Corwin testified that he knew Bender was at the LEC and wished to see defendant, and that he never told this to defendant. Sergeant Athey testified that upon learning of Bender's presence, he directed the officer on duty at the LEC's front desk not to allow Bender onto the second floor. Sergeant Athey also testified that he did not tell defendant about Bender. Sergeant Athey testified that shortly after he and Officer Rice concluded their interview, they encountered Bender in the LEC's lobby, at which time

Sergeant Athey told Bender that defendant "had not asked for Mr. Bender or any other attorney" and that defendant was being taken to the Mecklenburg County Jail. The trial court denied defendant's motion to suppress his post-arrest statements.

I.

[1] Defendant first assigns error to the trial court's denial of defendant's pre-trial motion to suppress inculpatory statements he made to the police following his arrest. Defendant contends that these statements should be suppressed because they were not made voluntarily, nor were they made pursuant to a voluntary, knowing, and intelligent waiver of defendant's constitutional right against compulsory self-incrimination. U.S. Const. amend. V; N.C. Const. art. I, § 23; *Miranda v. Arizona*, 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 706-07 (1966). We disagree.

In reviewing a trial court's ruling on a motion to suppress, the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001). However, the trial court's conclusions of law are fully reviewable by this Court. *State v. Perdue*, 320 N.C. 51, 59, 357 S.E.2d 345, 350 (1987).

At the conclusion of the suppression hearing, the trial court made findings of fact and conclusions of law, in pertinent part, as follows:

That the Defendant was arrested at his grandmother's home on the morning of September the 29th, 1998, at approximately 10:15 A.M.; [t]hat Officer Carmen Mendoza . . . testified . . . she accompanied [defendant] to the Law Enforcement Center and took notes of what he said on the way there; . . . [t]hat on the way to the Law Enforcement Center, the Defendant asked about his wallet, saying that it had money in it, which according to other testimony . . . proved to be correct; [t]hat [defendant] cursed and talked constantly[;] . . . Officer Mendoza never at any time asked the Defendant questions, and while with her the Defendant never requested a lawyer . . . ; Officer Mendoza observed no indication that the Defendant was impaired or smelled alcohol on his person . . . ; [u]pon arrival at the Law Enforcement Center, Sergeant Athey, Officer Jackson, Officer Corwin . . . and Officer Rice . . . participated in the interview of the Defendant, which began around [12:54 P.M.] on September the 29th, 1998, and continued for several hours thereafter; [t]hat . . . on September the

29th, 1998 . . . Harold Bender agreed to accept an appointment to represent the Defendant as his attorney in this case . . . ; Harold Bender went to the Law Enforcement Center and arrived there at 1:18 P.M. and asked to see the Defendant[;] [a]lthough Mr. Bender made repeated request to see the Defendant from 1:18 P.M. until 5:19 P.M., when Sergeant Athey informed Mr. Bender that the Defendant had not asked for a lawyer . . . Mr. Bender was not allowed to see the Defendant during this time . . . ; [t]hat Officer Jackson and Officer Corwin . . . began the interview with the Defendant at [12:54 P.M.], and continued until around 2:50 P.M., that day; [d]uring this time Officer Corwin advised the Defendant of his *Miranda* rights . . . both of the officers, Corwin and Jackson, stated in their opinion that the Defendant understood his *Miranda* rights as they were explained to him by Officer Corwin[;] [b]oth stated that he, the Defendant, did not appear impaired in any way . . . ; [p]rior to signing the *Miranda* rights waiver form, the Defendant was asked to read the last portion of the form, which states in essence that he understood the form but did not desire a lawyer at that time and desired to answer the officers['] questions; [u]pon Officers Corwin and Jackson leaving the interview room, Sergeant Athey and Officer Rice proceeded with the conclusion of the interview; [t]hat both Sergeant Athey and Officer Rice stated that the Defendant did not ask to have an attorney present . . . and they both stated that they did not notice anything wrong with the Defendant or that he appeared to be intoxicated or in any other way impaired; [t]hat . . . during the time Sergeant Athey and Officer Rice were with the Defendant, the Defendant made no complaints of being hungry, . . . and [defendant] admitted to shooting Deputy Stancil, initially stating that the gun had been hidden in his sock and it fell out of his sock and [defendant] subsequently made a statement; [t]hat some yes and no [questions] were asked of the Defendant and he replied with yes or no answers . . . ; [t]hat two teachers that had previously taught the Defendant . . . testified for the Defendant in this matter, and both stated that . . . at the time they saw [defendant], he was noted to be a behaviorally emotionally handicapped person and the[y] both stated that they did not believe that he could understand [his] *Miranda* rights, but both stated that they did not know whether he understood the *Miranda* rights that were given to him or not; [t]hat [Dr.] George Baroff also testified for the Defendant as an expert in the field of psychology with a speciality [sic] in mental retardation and a speciality [sic] in evaluating

the issues of a waiver of the Miranda rights; . . . [t]hat [Dr.] Baroff testified that when he tested the Defendant . . . on the 19th of December [Dr. Baroff]. . . found that [defendant] had a reading comprehension IQ of 62; [t]hat it was [Dr. Baroff's] opinion that the Defendant did not understand his rights because of the mode of presentation of the rights as he understood it and based on his interview with [defendant] and from what he understood about the case; [however, Dr.] Baroff did testify that he did not know whether the Defendant understood the rights form or not; [t]hat there was evidence presented that the Defendant had been involved in other criminal activity in 1996 and that at that time a waiver of rights form was read to him in basically the same manner that Officer Corwin read the rights to him, and in 1996 this rights form was explained to [defendant] by Officer Walter, and it was Officer Walter's testimony that the Defendant understood the waiver of rights at that time . . . . Based on the foregoing findings of fact and based on the totality of the circumstances, the [c]ourt makes the following conclusions of law: That the Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights before making any statements to the officers herein; [t]hat based thereon, the [c]ourt hereby denies the Defendant's motion to suppress his confession in this case.

Defendant contends that the trial court's findings do not support its conclusions that his post-arrest statements were made voluntarily and pursuant to a knowing, voluntary, and intelligent waiver of his *Miranda* rights. Specifically, defendant contends that his subnormal intelligence and mental condition combined with the coercive nature of the police interview to preclude a conclusion that both his *Miranda* waiver and his inculpatory post-arrest statements were made voluntarily.

First, we note that the trial court's pertinent findings are supported by competent evidence, and are thus binding on this Court. *Perdue*, 320 N.C. at 59, 357 S.E.2d at 350. At the suppression hearing, all four of the officers who interviewed defendant testified that the *Miranda* waiver was obtained, and the interview was conducted, under non-coercive conditions. Evidence was also presented that defendant understood his *Miranda* rights and that he was not intoxicated or otherwise impaired when he made his *Miranda* waiver and statements. We are bound by the trial court's findings even where the evidence is conflicting. *Buchanan*, 353 N.C. at 336, 543 S.E.2d at 826.

Next, we turn to the question of whether the trial court's findings support its conclusion that defendant's post-arrest statements were made voluntarily and pursuant to a knowing, intelligent, and voluntary waiver of his *Miranda* rights. Because defendant's purported waiver of his *Miranda* rights and the inculpatory statements arose within the same set of circumstances, we discuss the voluntariness of the inculpatory statements as a single issue. *State v. McKoy*, 323 N.C. 1, 22, 372 S.E.2d 12, 23, *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). A trial court's conclusion that a defendant's statement was given voluntarily is fully reviewable on appeal. *State v. Kemmerlin*, 356 N.C. 446, 457, 573 S.E.2d 870, 880 (2002). Upon review, this Court considers the totality of the circumstances surrounding the defendant's statement. *Id.* at 458, 573 S.E.2d at 880. The many factors to be considered include the length of the interrogation, the defendant's age and mental condition, whether the defendant had been deprived of food or sleep, whether the defendant was in custody, whether the defendant was deceived, whether the defendant was held incommunicado, whether threats of violence were made against the defendant, whether promises were made to obtain the confession, whether the defendant's *Miranda* rights were violated, and the defendant's familiarity with the criminal justice system. *State v. Hyde*, 352 N.C. 37, 45, 530 S.E.2d 281, 288 (2000), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001). "The presence or absence of one or more of these factors is not determinative." *State v. Barlow*, 330 N.C. 133, 141, 409 S.E.2d 906, 911 (1991).

In the instant case, the totality of the circumstances surrounding defendant's post-arrest statements support the trial court's conclusion that the statements were made pursuant to defendant's knowing, intelligent, and voluntary waiver of his *Miranda* rights. The trial court found that "Officer Corwin advised defendant of his *Miranda* rights" and that Officers Corwin and Jackson "stated in their opinion that the Defendant understood his *Miranda* rights as they were explained to him by Officer Corwin." The trial court also found that defendant read aloud the portion of the *Miranda* waiver form "which states in essence that [defendant] understood the form but did not desire a lawyer at that time and desired to answer the officers['] questions" and that defendant then signed the form. The trial court also found that Officers Mendoza, Jackson, Corwin, Rice, and Sergeant Athey each observed that defendant did not appear intoxicated or otherwise impaired while he was in their custody, and that each officer stated that defendant never requested an attorney.

The trial court also made findings that two of defendant's former schoolteachers "noted [defendant] to be a behaviorally emotionally handicapped person" and that Dr. Baroff determined that defendant "had a reading comprehension IQ of 62." However, our courts

[]have consistently held that a defendant's subnormal mental capacity is a factor to be considered when determining whether a knowing and intelligent waiver of rights has been made. Such lack of intelligence does not, however, standing alone, render an in-custody statement incompetent if it is in all other respects voluntary and understandingly made.

*State v. Fincher*, 309 N.C. 1, 8, 305 S.E.2d 685, 690 (1983) (citations omitted). The trial court found that while neither the schoolteachers nor Dr. Baroff believed that defendant was capable of understanding his *Miranda* rights, they did not know conclusively whether he was able to understand them or not. Further, the record contains evidence that defendant functions at a higher mental level than that ascribed to him by Dr. Baroff. At the suppression hearing, each officer who participated in the interview testified that defendant spoke and behaved rationally and coherently while being questioned. There was testimony that during the interview, defendant asked the officers questions concerning the evidence against him, which is further evidence of defendant's capacity for rational thought. The trial court's findings and the evidence of record thus permitted a conclusion that defendant had sufficient mental capacity to waive his *Miranda* rights and voluntarily make inculpatory statements.

The trial court made findings that Officers Jackson and Corwin interviewed defendant on 29 September 1998 from approximately 12:54 p.m. until approximately 2:50 p.m., and that Sergeant Athey and Officer Rice thereafter questioned defendant until approximately 4:40 p.m. Our Supreme Court has held that interrogations of longer duration than the one at hand are not so lengthy as to render them coercive. *State v. Greene*, 332 N.C. 565, 580, 422 S.E.2d 730, 739 (1992); *State v. Morgan*, 299 N.C. 191, 199-200, 261 S.E.2d 827, 832, *cert. denied*, 446 U.S. 986, 64 L. Ed. 2d 844 (1980). Further, the trial court found that defendant "made no complaints of being hungry" to Sergeant Athey or Officer Rice, and the record reveals that defendant was provided with a soft drink, a cup of water, and bathroom breaks upon request during his interview. The trial court did not find that the police made either any threats of physical violence against defendant or promises to him in exchange for his *Miranda* waiver and statement, and the record contains no evidence of such circumstances.

The trial court also found that defendant had some familiarity with the criminal justice system arising from an episode in 1996 where he was questioned by police after "a waiver of rights form was read to him in basically the same manner that Officer Corwin read the rights to him." A defendant's prior experience with the criminal justice system, even where the experience consists of a single prior arrest, is "an important consideration in determining whether an inculpatory statement was made voluntarily and understandingly." *Fincher*, 309 N.C. at 20, 305 S.E.2d at 697.

While there is evidence that Officer Rice led defendant to mistakenly believe that his fingerprints had been recovered from Captain Stancil's holster, "[d]eception or trickery is merely one of the circumstances that the court may consider in looking at the totality of the circumstances surrounding the confession." *State v. Jackson*, 308 N.C. 549, 582, 304 S.E.2d 134, 152 (1983). Standing alone, such actions are insufficient to render defendant's inculpatory statements inadmissible. *Id.*

Finally, we note the trial court's finding that "at no time from the time he . . . was taken to the Law Enforcement Center on September 29, 1998, until the time he left the Law Enforcement Center to go to the Intake Center, did the Defendant ever, at any time, request a lawyer . . . to be present while he was talking to the officers in this matter." Our courts have held that:

> the law in North Carolina is that the right to counsel belongs to the defendant, and he retains it even after counsel is appointed. Thus, the attorney may advise a defendant, but he cannot control defendant's own exercise of his constitutional rights. If defendant's waiver of his right to counsel is otherwise voluntary, knowing, and intelligent, his lawyer's wishes to the contrary are irrelevant.

*State v. Reese*, 319 N.C. 110, 135, 353 S.E.2d 352, 366 (1987) (citations omitted) (*overruled on other grounds by State v. Barnes*, 345 N.C. 184, 233, 481 S.E.2d 44, 71 (1997), *cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998)). We are bound by the trial court's finding that defendant never requested an attorney, since that finding is supported by competent evidence. *Perdue*, 320 N.C. at 59, 357 S.E.2d at 350. Despite the trial court's findings that (1) Harold Bender was appointed to represent defendant on the day defendant was arrested; (2) Bender arrived at the LEC shortly after defendant's interview began and repeatedly requested that he be allowed to see defendant,

to no avail; and (3) Sergeant Athey knew of Bender's presence at the LEC and ordered that Bender not be allowed onto the second floor, we must therefore conclude that the actions of the police in not allowing Bender to see defendant at the LEC did not invalidate defendant's *Miranda* waiver or statements. *Moran v. Burbine*, 475 U.S. 412, 422, 89 L. Ed. 2d 410, 421 (1986) (rejecting the argument that police refusal to inform defendant of his attorney's attempts to reach him undermines validity of defendant's otherwise proper waiver); *State v. Hyatt*, 355 N.C. 642, 658, 566 S.E.2d 61, 72 (2002), *cert. denied*, —— U.S. ——, 154 L. Ed. 2d 823 (2003) ("an otherwise intelligent, knowing, and voluntary waiver of Fifth Amendment rights is unaffected by a suspect's lack of knowledge about his or her attorney's wishes or efforts").

For the foregoing reasons, we conclude that the totality of the circumstances supported the trial court's conclusion that defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights and that his post-arrest statements were made voluntarily. We find no error in the denial of defendant's motion to suppress the statements, and this assignment of error is overruled.

II.

**[2]** Next, defendant assigns error to the trial court's denial of his pretrial motion that he be declared incompetent to stand trial. Specifically, defendant contends that by finding Dr. Mathew did not render an opinion as to defendant's competency, the trial court did not properly consider Dr. Mathew's testimony at the competency hearing. We find this assignment of error to be without merit.

Our legislature has expressly provided that a defendant may not be tried, convicted, sentenced or punished for a crime when

> by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner.

N.C. Gen. Stat. § 15A-1001(a) (2001). At the competency hearing, defendant's counsel conceded that defendant was able to understand the nature and object of the proceedings against him and to comprehend his situation in reference to the proceedings. Therefore, defendant's motion was based solely on his contention that he was unable to assist in his defense in a rational or reasonable manner.

A defendant who moves under N.C. Gen. Stat. § 15A-1001 for a determination that he is incapable of proceeding bears the burden of persuasion. *State v. Baker*, 312 N.C. 34, 43, 320 S.E.2d 670, 677 (1984). "The court's findings of fact as to defendant's mental capacity are conclusive on appeal if supported by the evidence." *Id.*

In the instant case, defendant and the State each offered two expert witnesses at the competency hearing. The trial court made the following pertinent findings of fact and conclusions of law:

> That the [c]ourt heard testimony from Dr. George Baroff, who . . . was admitted as an expert in the field of mental retardation . . . ; [t]hat it was the opinion of Dr. Baroff, that the Defendant would be extraordinarily at a disadvantage about what evidence the Defendant would be able to help his attorneys present in a trial of this matter based on the psychological testing that he had done[;] . . . [t]hat on cross-examination by the State, Dr. Baroff . . . said that the defendant indicated to him that the key facts of this case were the bullet, the witness against him, and that he was out there at the time, which so indicates to the [c]ourt he is fully aware of what he's facing[;] . . . [t]hat the [c]ourt further heard testimony from . . . Dr. Roy Mathew, who is an expert in the field of psychiatry . . . [a]nd that Dr. Mathew was primarily attempting to determine the effect of the Defendant's alcohol and drug abuse on his mental status, and that due to the failure to cooperate, he was frustrated in that regard, and . . . the [c]ourt doesn't find he gave an opinion as to what the competency of the Defendant to proceed in this matter was[;] [t]hat the [c]ourt further heard testimony from Dr. Nicole Wolfe, who testified that she spent time interviewing the Defendant . . . [and] [t]hat she found no evidence of . . . active mental illness[;] . . . [t]hat it was her opinion that [defendant] was competent to stand trial, that he was able to assist his attorneys if he chose to do so, . . . it was her opinion that [defendant] was not mentally retarded[;] . . . [t]hat Dr. Wolfe stated that the history of bacterial meningitis was about as minor . . . as one could have, and that there was no evidence of any mental disabilities as a result of that[;] . . . [t]hat there was further [testimony] from Dr. [sic] Bart Abplanalp . . . [w]ho was a clinical psychologist, and who also had administered psychological testing of the Defendant . . . that [Abplanalp's] belief was that the Defendant was malingering . . . that there was a noted difference in [defendant's] behavior in informal[ly] talking to him, and also in the formal test[;] [t]hat he believed [defendant] was per-

forming poorly on purpose[;] [t]hat [defendant's] school records failed to show any mental retardation[;] . . . [t]hat it was his opinion, that the Defendant definitely understood the legal system. That based on the foregoing findings of fact, the [c]ourt concludes as a matter of law that the Defendant . . . is able to assist in his defense in a rational and reasonable manner, and that he's competent to stand trial.

We find that the trial court's findings of fact are amply supported by the evidence received at the competency hearing, and are therefore binding on this Court. *Baker*, 312 N.C. at 43, 320 S.E.2d at 677 (1984). Both Dr. Wolfe and Mr. Abplanalp testified that, based on their interviews with defendant and reviews of his test results and school and medical records, they believed that defendant did not suffer from any active mental illness and that he was competent to stand trial. Defendant's recitation to Dr. Baroff of the "key facts of the case" against him also supports the conclusion that defendant was able to assist in his defense in a rational and reasonable manner.

With respect to Dr. Mathew's testimony, the trial court's finding that he did not give an opinion as to defendant's competency to proceed was supported by the evidence, and this finding is therefore conclusive on appeal. *Id.* When asked whether he had an opinion as to whether defendant could assist in his own defense in a rational and reasonable manner, Dr. Mathew replied that he "tried to explain to [defendant] what my role was . . . he didn't seem to be able to comprehend it at all . . . we didn't get very far." When asked whether defendant could make a reasonable and rational decision regarding acceptance of a potential juror, Dr. Mathew replied "[t]hat's a difficult question for me to answer, because that's more for a neuropsychologist to answer . . . my own opinion would be that he would have a hard time doing that." Finally, when asked whether defendant could reasonably and rationally decide what evidence to present, or what witnesses to call, Dr. Mathew replied "that's outside of my limits of expertise. I would expect him to have difficulties." We find that this evidence supports the trial court's finding that Dr. Mathew did not give an opinion as to defendant's competency to proceed, and therefore the trial court did properly consider his testimony at the competency hearing. This assignment of error is overruled.

We hold, for the reasons stated herein, that defendant received a trial free of any error.

No error.

Chief Judge EAGLES and Judge McCULLOUGH concur.